[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14991
_____

D.C. Docket No. 1:14-cr-20367-CMA-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MARIO WILCHCOMBE, NATHANIEL ERSKINE ROLLE, ALTEME
HIBERDIEU BEAUPLANT,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(October 4, 2016)

Before MARCUS, JORDAN and WALKER,[*] Circuit Judges.

_____

[*] Honorable John M. Walker, Jr., United States Circuit Judge for the Second Circuit, sitting by
designation.

WALKER, Circuit Judge:

Defendants Mario Wilchcombe, Nathaniel Erskine Rolle, and Alteme Hiberdieu Beauplant appeal from a judgment entered in the United States District Court for the Southern District of Florida (Altonaga, *J.*) following a jury trial convicting (1) all defendants of conspiring to possess with intent to distribute and possessing with intent to distribute five kilograms or more of cocaine and 100 kilograms or more of marijuana while on board a vessel subject to U.S. jurisdiction, in violation of 46 U.S.C. §§ 70503(a) and (b) and 70506(a), 21 U.S.C. §§ 960(b)(1)(B) and (2)(G) and 18 U.S.C. § 2; and (2) Rolle individually of failing to obey a lawful order to heave to his vessel of which he was the master, operator, and person in charge, in violation of 18 U.S.C. § 2237(a)(1).  The district court sentenced Beauplant and Wilchcombe principally to 120 months' imprisonment and Rolle to 135 months' imprisonment.

On appeal, the defendants argue that (A) the district court lacked subject matter jurisdiction over the prosecution; (B) the evidence was insufficient to support Wilchcombe's conviction; (C) the district court erred in failing to declare a mistrial based on improper prosecutorial comment on Rolle's and Beauplant's post-custody, pre-*Miranda* silence; (D) the district court erred in denying Beauplant's motion to dismiss on the basis of the unavailability of favorable evidence; and (E) the district court abused its discretion in admitting uncharged

2

misconduct evidence against Beauplant.    Finding no merit in any of these arguments, we AFFIRM.

## I.

## A.

Keno Wade Russell, a Bahamian fisherman and cooperating witness, and members of the Coast Guard testified to the following facts.

In April 2014, Russell met in the Bahamas with a drug smuggler known as Kool Aid, Rolle, and two other men.  During the meeting, Rolle agreed to use his small fishing boat, located in Haiti, to bring drugs from Haiti to the Bahamas. Kool Aid gave Rolle money to fly to Haiti and arranged to travel with Russell to Haiti via freighter.  The men agreed that once Kool Aid and Russell arrived in Haiti, they would meet with Rolle; Mario Wilchcombe, a longtime acquaintance of Russell; and another drug smuggler named Enoch.

After arriving in Haiti, Kool Aid and Russell met Enoch, Rolle, Wilchcombe, and Beauplant on the Île de la Tortue, where they remained for a week.  Russell, Rolle, Beauplant, and others (not including Wilchcombe) loaded cocaine and marijuana onto Rolle's boat, stacking the bales on the deck and placing drugs in the center console.  When the boat was ready for departure, a 17-year-old Haitian named either Pepe Anri or Pepe Henri ("Henri"), arrived at the boat, and Enoch told Rolle to bring Henri to the Bahamas.

3

On May 3, 2014, at around seven or eight in the evening, Rolle's boat left Haiti with Rolle, Wilchcombe, Beauplant, Russell, and Henri on board. A few hours later, the crew of the United States Coast Guard cutter *Charles Sexton*, which was patrolling the ocean between Cuba and Haiti, received a tip that a boat carrying drugs had recently departed from the Île de la Tortue. Shortly thereafter, the *Charles Sexton* began tracking Rolle's boat, which was powered by two engines and was heading north at 10 to 15 knots per hour. Because of the boat's relatively high speed, Lieutenant Scott Nichols and four other crewmen left the cutter to pursue the target in a small rubber chase boat.

As the chase boat approached, Rolle's boat increased its speed and continued to travel with its lights off. The chase boat turned on its lights, spotlight, flashing blue lights, and siren. After the chase boat fixed Rolle's boat in its spotlight, its crewmembers saw that Rolle's boat was not flying a flag. At that point, Petty Officer Michael Irigoyen ordered Rolle's boat to stop. Instead, Rolle further increased the speed of his boat and made a series of evasive turns while repeatedly looking back at the chase boat. During the pursuit, two men in addition to Rolle stood on the deck of Rolle's boat and spent approximately 10 minutes throwing large packages into the water. After they finished, Rolle slowed his boat.

After the chase boat pulled alongside Rolle's boat, Lieutenant Nichols saw two men on board in addition to Rolle and the two men who had been jettisoning

4

packages.  One of the newly-spotted men was near the front and the other was near the back by the engines.  It appeared to Lieutenant Nichols that the man near the engines, later identified as Wilchcombe, had been laying on the deck.  Russell explained at trial that Wilchcombe had been holding a loose wire in place so that one of the engines, which had malfunctioned during the trip, could continue to function.

Two members of the Coast Guard boarded Rolle's boat and turned off the engines.  They returned to the chase boat and Lieutenant Nichols questioned the men on Rolle's boat to determine the identity of the captain, the boat's country of registration, and its destination.  Rolle responded that he was from the Bahamas and owned the boat, which was registered in the Bahamas.  He said that two of the other men on the boat were Bahamian and that the other two were Haitian.  He said that he was traveling between Bahamian islands.  To Lieutenant Nichols, the men on Rolle's boat appeared calm and relaxed.  None asked to speak with him privately.

Lieutenant Nichols radioed the information provided by Rolle back to the cutter, and the Coast Guard requested that the Bahamian Government provide a statement of no objection ("SNO"), which would allow the Coast Guard to board Rolle's Bahamian-registered boat for law-enforcement reasons.  The time between the request and the response was approximately two hours.  While the crew of the

5

chase boat waited, Lieutenant Nichols saw Rolle speaking with the man later identified as Russell and directed them to stop.

After receiving word from the cutter that the Bahamian Government had confirmed that the target vessel was registered in the Bahamas and had provided the SNO, Lieutenant Nichols and Petty Officer Irigoyen boarded Rolle's boat, frisked the occupants, and found several pocketknives on the men and nearly $2,000 in cash in Rolle's waistband. In response to a question, Rolle said that he and two friends were giving a ride to two other friends. The Coast Guard took the passengers into custody and Lieutenant Nichols and Petty Officer Irigoyen searched the boat. During the search, Lieutenant Nichols and Petty Officer Irigoyen took photos and seized personal effects. They also inspected Rolle's boat to determine whether it could be towed to port. After determining that this would be neither feasible nor safe, the Coast Guard sank the boat.

By the time that Lieutenant Nichols and Petty Officer Irigoyen completed the search and returned to the cutter with the suspects, the cutter's crew had recovered 40 packages that had been thrown overboard, along with two duffel bags and a GPS. The packages contained 35 kilograms of cocaine and 860 kilograms of marijuana. The Coast Guard detained the men aboard the cutter for a few days during which time they learned their identities.

Throughout their detention on the chase boat and the *Charles Sexton*, the men were placed in leg irons. They were not read their *Miranda* rights. None were interrogated nor did any ask to speak privately with any members of the Coast Guard. However, at one point, when Petty Officer Irigoyen and Rolle were alone together, Rolle expressed his belief that Petty Officer Irigoyen was the boss and asked him to cut him some slack. Similarly, Russell told Petty Officer Irigoyen that he had fallen on hard times after his fishing boat broke down and he was unable to provide for his family.

After a few days, the men were transferred from the *Charles Sexton* to a second Coast Guard cutter, the *Paul Clark*, and Henri was repatriated to Haiti. After the transfer, Beauplant told an interpreter that he was Haitian, that he had been stranded, and that the Bahamians had offered him a ride. He also said he had been traveling with Henri, an orphan from his village, to whom he was not related.

At trial, Rolle, the only defendant to testify, told a very different story. He claimed that Russell had tricked him and then forced him and Wilchcombe at gunpoint to bring the drugs from Haiti to the Bahamas. He also testified that Beauplant and Henri had stowed away in his boat and that he did not know they were there until after the journey was well underway.

B.

On May 22, 2014, Rolle, Wilchcombe, Beauplant, and Russell were indicted for conspiring to possess with intent to distribute and possessing with intent to distribute five kilograms or more of cocaine and 100 kilograms or more of marijuana while on a vessel subject to the jurisdiction of the United States, in violation of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70503(a) and (b) and 70506(a), 21 U.S.C. §§ 960(b)(1)(B) and (2)(G) and 18 U.S.C. § 2. Rolle was also charged with failing to obey a lawful order to heave to his vessel, of which he was the master, operator, and person in charge, in violation of 18 U.S.C. §2237(a)(1).

Russell pleaded guilty to conspiracy to distribute cocaine and marijuana and agreed to cooperate with the government by testifying at the trial of Rolle, Wilchcombe, and Beauplant.

On July 28, 2014, the trial of Rolle, Wilchcombe, and Beauplant began. The district court empaneled two juries, one for Rolle and Wilchcombe and the other for Beauplant, to avoid any potential prejudice that could result from evidence of Beauplant's prior criminal trafficking. All three men were convicted on all charges. The district court sentenced Beauplant and Wilchcombe principally to 120 months' imprisonment and Rolle to 135 months' imprisonment.

II.

A.

The defendants advance multiple arguments in urging us to conclude that the district court lacked jurisdiction over this case. We review de novo "a district court's interpretation and application of statutory provisions that go to whether the court has subject matter jurisdiction" and review factual findings related to jurisdiction for clear error. *United States v. Tinoco*, 304 F.3d 1088, 1114 (11th Cir. 2002) (internal quotation marks omitted).

1.

Wilchcombe and Rolle first argue that the MDLEA violates the Due Process Clause because it does not require proof of a nexus between the United States and a defendant. Because we have previously rejected this argument, *United States v. Campbell*, 743 F.3d 802, 810 (11th Cir. 2014), *cert. denied,* 135 S. Ct. 704 (2014), they seek en banc review.

We cannot reconsider this issue, nor do we support en banc review. The text of the MDLEA does not require a nexus between the defendants and the United States; it specifically provides that its prohibitions on drug trafficking are applicable "even though the act is committed outside the territorial jurisdiction of the United States." 46 U.S.C. § 70503(b). The Constitution and principles of international law support our interpretation of the MDLEA, *Campbell*, 743 F.3d at

9

810, and Wilchcombe and Rolle make no convincing arguments to the contrary. Further, of the other circuits to have considered this question, all but one share our view. *Compare United States v. Suerte*, 291 F.3d 366, 369-72 (5th Cir. 2002) (stating that the due process does not require a nexus for the MDLEA to apply outside the territorial jurisdiction of the United States), *and United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999) (same), *and United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993) (same), *with United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998) (stating that the MDLEA requires a nexus). Accordingly, we reject Wilchcombe's and Rolle's arguments that our interpretation of the MDLEA violates due process.

2.

Rolle, Wilchcombe, and Beauplant argue that the government failed to establish jurisdiction over Rolle's boat because the SNO obtained from the Bahamian Government does not conform to the requirements of 46 U.S.C. § 70502(c)(1)(C).

The MDLEA permits the United States to exercise jurisdiction over "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States." 46 U.S.C. § 70502(c)(1)(C). Under the MDLEA, a foreign nation can consent or waive objection "by radio, telephone, or similar oral or electronic means[,] and [this

10

consent or waiver] is proved conclusively by certification of the Secretary of State or the Secretary's designee," *id.* at § 70502(c)(2), although courts must still determine whether the MDLEA's jurisdictional requirements have been met, *see United States v. McPhee,* 336 F.3d 1269, 1272 (11th Cir. 2003).

The defendants focus specifically on claimed defects in the language of the SNO, but we have never required the language in SNOs to precisely mirror the language contained in the MDLEA; to the contrary, we have approved of SNOs that did not. For example, in *United States v. Brant-Epigmelio*, 429 F. App'x 860, 862 (11th Cir. 2011) (unpublished), we considered the effect of two SNOs, one of which "waived objection to the enforcement of U.S. law by the United States," and the other of which "waived objection to the enforcement of U.S. law by the United States over the Colombian crewmember of the . . . vessel." We held that the variation in language between the two was "immaterial," as long as "both show that the [foreign] government . . . waived objection to the enforcement of United States law." *Id.* at 863. In *United States v. Persaud*, 605 F. App'x 791, 795 (11th Cir. 2015) (unpublished), we stated that the district court's receipt of an "[SNO] stating that Jamaica waived primary jurisdiction over" the defendant meant that the district court did not err in concluding that it had jurisdiction under the MDLEA.

Here, Coast Guard Commander Fazio, a designee of the Secretary of State, certified to the district court that "the Government of the United States requested

11

the [Bahamian Government] consent to the United States exercising jurisdiction over the vessel" and the Bahamian Government "notified the Government of the United States that it waived its right to exercise primary jurisdiction over the vessel." The language informing the United States that the Bahamian Government "waived its right to exercise primary jurisdiction over the vessel" is similar to the language in the SNO that we approved in *Persaud*, differing only in that it mentions the vessel instead of the specific defendants. In fact, the SNO in this case actually hews closer to the MDLEA than the *Persaud* SNO, because both this SNO and the MDLEA speak of a waiver of jurisdiction over the vessel and not the defendants.

Although *Persaud* and *Brant-Epigmelio* do not bind us because they are unpublished opinions, we are persuaded that their approach is correct. Accordingly, we reiterate that, as long as the substance of the consent or waiver is communicated, the language contained in SNOs need not exactly track the language contained in § 70502(c)(1)(C) to satisfy the requirements of the MDLEA. The SNO in this case was sufficient to inform the United States that the Bahamian Government consented to the United States' exercise of jurisdiction over Rolle's vessel.

3.

Beauplant and Rolle argue here, as they did to the trial court, that the evidence at trial demonstrated that the Coast Guard misled the Bahamian Government about the documentation of the registration status of Rolle's boat that was available to the Coast Guard when it was seeking the SNO. If the Bahamian Government had been accurately informed of the existing documentation, the defendants argue, the Coast Guard would have had to await the arrival of a Bahamian law enforcement officer before boarding the boat.

We agree with Beauplant and Rolle that the evidence presented at trial suggests that the Coast Guard may have incorrectly informed the Bahamian Government about the registration documents provided by Rolle to the Coast Guard. An affidavit from Commander Fazio, on which the district court relied before trial to determine whether the U.S. had jurisdiction over Rolle's boat, states that when the Coast Guard initially contacted the Bahamian Government, the Coast Guard stated that they had found the registration number painted on the hull of the boat. The affidavit also states that no other registration information was provided to the Coast Guard at this time. Lieutenant Nichols' trial testimony supports this version of events. He testified that he recovered the registration documents in one of the bags thrown overboard, and therefore the documents would not have been

13

available to Commander Fazio when he contacted the Bahamian Government for the SNO.

At trial, Russell provided contradictory testimony. He asserted that Rolle showed his registration card to the Coast Guard before the officers boarded the boat. This version of events is supported by the fact that the registration card was listed in the inventory of objects found on Rolle when he was searched.

There are multiple reasons why this inconsistency does not lead us to fault the district court's decision to exercise jurisdiction over the defendants. First, given the contradictory evidence in the record, we cannot say that the district court committed "clear error," *Tinoco*, 304 F.3d at 1114, in concluding that the facts here supported the exercise of jurisdiction. Second, even if we accept the defendants' claim that Commander Fazio had seen Rolle's registration card but told the Bahamian Government that he had not, this fact, in the context of this case, does not render the exercise of jurisdiction improper. The Coast Guard cannot have obtained an advantage from any such misrepresentation because Commander Fazio informed the Bahamian Government that Rolle's boat had the registration number painted on its hull, thus permitting the Bahamian Government to check the boat's registration if it wished to do so. Finally, despite the defendants' assertions to the contrary, there is also no evidence in the record of bad faith or intentional misrepresentations on the part of the Coast Guard, a fact which a district court may

14

take into account when determining whether a foreign government has consented to the United States' exercise of jurisdiction pursuant to the MDLEA. *See id.* (considering whether the Coast Guard had acted in bad faith in providing inaccurate information to the Colombian government about a vessel's registration and concluding that it did not matter because the inaccurate information did not affect the Colombian government's response).

We accordingly reject this challenge to the district court's exercise of jurisdiction.

B.

Wilchcombe argues that the government's evidence only proved that he was present at the scene of the drug trafficking conspiracy, not that he participated in it. Put another way, he asserts that the government did not disprove his "mere presence" defense to the charges of conspiring to possess with intent to distribute and possessing with intent to distribute five kilograms or more of cocaine and 100 kilograms or more of marijuana.

We review de novo challenges to the sufficiency of the evidence supporting a criminal conviction. *United States v. Dominguez*, 661 F.3d 1051, 1061 (11th Cir. 2011). The evidence, viewed in the light most favorable to the government, must be such that "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted). "We assume

15

that the jury made all credibility choices in support of the verdict and accept all reasonable inferences that tend to support the government's case." *Id.* (internal quotation marks omitted).

In maritime drug-trafficking cases, "[a] jury may find knowledgeable, voluntary participation from presence when the presence is such that it would be unreasonable for anyone other than a knowledgeable participant to be present." *United States v. Cruz-Valdez*, 773 F.2d 1541, 1546 (11th Cir. 1985). In making this determination, a jury may consider factors such as

> (1) [the] probable length of the voyage, (2) the size of the contraband shipment, (3) the . . . close relationship between captain and crew, (4) the obviousness of the contraband, and (5) other factors, such as suspicious behavior or diversionary maneuvers before apprehension, attempts to flee, inculpatory statements made after apprehension, witnessed participation of the crew, and the absence of supplies or equipment necessary to the vessel's intended use.

*Tinoco*, 304 F.3d at 1123. The government bears a heavier burden where the quantity of drugs is smaller; if the quantity of drugs is "large," the government need only prove any one of the additional factors listed above. *Id.*

Here, the evidence is sufficient to sustain Wilchcombe's convictions for conspiring to possess with intent to distribute and possessing with intent to distribute under the MDLEA. *See id.* at 1123-24 (stating that "the circumstances that were sufficient to support the appellants' conspiracy conviction also support their conviction on the possession count" under the MDLEA). Plainly, given the

16

relatively small size of the boat, 895 kilograms, or nearly one ton, of narcotics is a "large quantity." *See id*. But even if that were not the case, ample additional evidence defeats the insufficiency argument. As Russell testified, some of the drugs were stored on deck. A reasonable jury could have inferred on the basis of this testimony that the drugs would have been obvious to Wilchcombe at the start of the voyage. Testimony from both Russell and members of the Coast Guard permitted the jury to find that Wilchcombe had aided the boat's attempts to evade capture by lying on the deck and holding a wire in place so that the second engine could operate. Finally, Russell's testimony provided evidence that Wilchcombe had close relationships with Rolle, who captained the boat; with Beauplant; and with Russell himself. Russell specifically testified that he had known Wilchcombe for a long time and that Wilchcombe had spent time before the voyage getting to know the other passengers. The relationships between Wilchcombe and the crew members made it more likely that Wilchcombe knew of the presence of the drugs on the boat.

In sum, because a reasonable jury could have concluded from the government's evidence that Wilchcombe was not simply present on Rolle's boat but was a knowing participant in the conspiracy, we reject Wilchcombe's argument that the evidence was insufficient to support his convictions.

17

C.

Beauplant and Rolle argue that the district court erred when it refused to declare a mistrial based on the government's comments at trial on their silence after they were taken into custody.

The defendants did not receive a *Miranda* warning at any point while they were in the custody of the Coast Guard and government witnesses testified about the defendants' silence at several points after their boat had been intercepted. For the purposes of this discussion, we assume that the defendants were in custody from the time that the Coast Guard crew first boarded Rolle's boat, turned off the motor, and returned to their own boat. At this time the defendants were kneeling on board their boat with their hands draped over the gunnel so that the Coast Guard could watch them. Petty Officer Irigoyen testified that the Coast Guard "made it clear that we had no intent on having a conversation" with them but did not entirely stop them from talking to the Coast Guard or to each other. The government elicited testimony that the defendants remained quiet and did not attempt to talk to the Coast Guard. Later, after the Coast Guard transferred the defendants to the *Charles Sexton* and took their photographs, two crewmembers testified that the detainees did not attempt to talk to them. In summation, the government repeatedly referred to the defendant's silence aboard their own boat and aboard the *Charles Sexton* to make the argument that, if the defendants were

18

on the ship under duress, as Rolle had testified, they would have sought help by trying to speak with members of the Coast Guard.

A district court's decision not to grant a mistrial on the basis of comments regarding a defendant's choice to remain silent is reviewable for abuse of discretion. *United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999). A defendant in custody after receiving *Miranda* warnings indisputably has the right under the Fifth Amendment to remain silent. *See Oregon v. Elstad*, 470 U.S. 298, 304 (1985). The Supreme Court has stated, however, that it is constitutionally permissible to use a defendant's post-arrest, pre-*Miranda* silence to impeach a defendant. *Brecht v. Abrahamson*, 507 U.S. 619, 628 (1993). The Eleventh Circuit goes a step further. We permit the prosecution to use a defendant's post-arrest, pre-*Miranda* silence as direct evidence that may tend to prove the guilt of the defendant. *United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991) ("[T]he government may comment on a defendant's silence when it occurs after arrest, but before *Miranda* warnings are given."). *See also United States v. Valencia*, 169 F. App'x 565, 574-75 (11th Cir. 2006) (unpublished) (citing *Rivera* for the proposition that the government could comment on the silence of defendants who were in custody but who had not received *Miranda* warnings). *But see United States v. Campbell*, 223 F.3d 1286, 1290 (11th Cir. 2000)

19

(acknowledging a challenge to *Rivera*'s statement regarding the "broad use of pre-*Miranda* silence" but declining to "sort out this confusion").

The defendants correctly point out that the circuit courts do not agree as to when the government may comment on a defendant's silence. The First, Second, Sixth, and Seventh Circuits prohibit the use of even pre-arrest silence as substantive evidence of guilt. *United States v. Okatan*, 728 F.3d 111, 120 (2d Cir. 2013); *Ouska v. Cahill-Masching*, 246 F.3d 1036, 1049 (7th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 560 (6th Cir. 2000); *Coppola v. Powell*, 878 F.2d 1562, 1568 (1st Cir. 1989). *But see United States v. Zarauskas*, 814 F.3d 509, 515-16 (1st Cir. 2016) (We assume "without deciding, that prosecutorial comment on the defendant's pre-custodial silence violates the Fifth Amendment."). The Ninth, Tenth, and D.C. Circuits prohibit the use of post-arrest, pre-*Miranda* silence as substantive evidence of guilt. *United States v. Hernandez*, 476 F.3d 791, 796 (9th Cir. 2007); *United States v. Moore*, 104 F.3d 377, 389 (D.C. Cir. 1997); *United States v. Burson*, 952 F.2d 1196, 1200-01 (10th Cir. 1991). In addition to the Eleventh Circuit, the Fourth and Eighth Circuits permit the government to comment on a defendant's silence at any time prior to the issuance of *Miranda* warnings. *United States v. Cornwell*, 418 F. App'x 224, 227 (4th Cir. 2011) (unpublished); *United States v. Osuna-Zepeda*, 416 F.3d 838, 844 (8th Cir. 2005).

*See also United States v. Pando Franco*, 503 F.3d 389, 395 n.1 (5th Cir. 2007) (describing circuit split on this issue).

Although the Supreme Court once granted certiorari to resolve this question, the Court ultimately decided the case on other grounds, leaving the circuit split in place. *Salinas v. Texas*, 133 S. Ct. 2174, 2179 (2013). In *Salinas*, the Court held that a defendant's silence in response to a question in a non-custodial interview by a law-enforcement officer was admissible as substantive evidence of his guilt because the defendant did not "expressly invoke the privilege against self-incrimination in response to the officer's question." *Id*. at 2178. The fact that the *Salinas* defendant was not in custody at the time of his silence was central to the Court's determination that his silence could be used as substantive evidence of guilt. *Id.* at 2178, 2180. Where, as here, a suspect is in custody, he "cannot be said to have voluntarily forgone the privilege [against self-incrimination] unless he fails to claim it after being suitably warned." *Id.* at 2180 (alterations and internal quotation marks omitted). *Salinas* therefore does not provide support for the prosecution's comments in this case.

Given our precedent on this issue, however, we cannot conclude that the district judge abused her discretion in declining to declare a mistrial on the basis of the challenged conduct. Whatever the state of the law in other circuits, in our circuit it was permissible for the government to comment on Beauplant's silence.

21

In any event, any error caused by the government's comment on Beauplant's and Rolle's pre-*Miranda* silence that might have occurred would not warrant reversal. As to Beauplant, any such error would have been harmless in light of the ample evidence of his guilt that was presented at trial. *See United States v. Davila*, 749 F.3d 982, 992 (11th Cir. 2014). As for Rolle, who did testify at trial, *Brecht*, 507 U.S. at 628, permitted the government to use his pre-*Miranda* silence to impeach his trial testimony to the effect that Russell had coerced him into carrying the drugs and that he was frightened of Russell.

Therefore, the district court did not abuse its discretion in declining to grant a mistrial as to Beauplant and Rolle.

## D.

Beauplant argues that the government violated his due process rights both by destroying the boat without photographing the central console and by repatriating Henri, whose version of what happened could have aided his defense. Because Rolle testified that Beauplant and Henri had stowed away in the boat's center console, Beauplant believes that an examination of the boat and Henri's testimony would have supported Rolle's testimony.

We will not pause to address the government's assertion that Beauplant has waived this argument based on his failure to raise it before trial because we agree with the government on the merits. *See United States v. Mathis*, 767 F.3d 1264,

22

1277 n.6 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 1448 (2015).  Whether there was a due process violation as a result of the government's destruction of evidence or failure to preserve evidence is a mixed question of law and fact.  *United States v. Revolorio-Ramo*, 468 F.3d 771, 774 (11th Cir. 2006).  We review the district court's factual determinations for clear error and its legal conclusions de novo.  *Id.*

To establish that the destruction of evidence constitutes a violation of due process, "[a] defendant must show that the evidence was likely to significantly contribute to his defense."  *Id.* (internal quotation marks omitted).  This means that the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *Id.* (internal quotation marks omitted).  The defendant must also demonstrate that the government acted in bad faith.  *Id.*  To prove a violation of a defendant's constitutional rights resulting from the government's deportation of a witness, a defendant must "show that there was a reasonable basis to believe that the testimony would be material and favorable to him, and that the government had acted in bad faith in repatriating the alien[]."  *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1212-13 (11th Cir. 2010).

Beauplant cannot satisfy the bad faith requirement here.  Nothing in the record suggests that the Coast Guard, in destroying the boat without photographing

23

it or in repatriating Henri, acted in bad faith.  In support of his claim regarding the boat's destruction, Beauplant asserts nothing beyond the fact that the Coast Guard misallocated its resources in choosing to collect the drug bales rather than measuring and photographing the center console where Russell testified that Beauplant hid.  Such a typical and reasonable law enforcement decision about how to allocate limited resources and manpower does not permit an inference of bad faith.  As for the decision to repatriate Henri, Beauplant has not made any showing that, in deciding to allow Henri to return to Haiti, the Coast Guard believed that he would provide exculpatory testimony.  Speculation to that effect cannot support his claim that the Coast Guard acted in bad faith.

Accordingly, we conclude that the district court properly denied Beauplant's motion to dismiss on this basis.

### E.

Beauplant argues that the district court erred by permitting a DEA agent to testify that in 2010, the Bahamian authorities arrested Beauplant because he was the captain of a Haitian freighter that had arrived in the Bahamas carrying 165 kilograms of cocaine and some marijuana.  Beauplant asserts that, in violation of Federal Rule of Evidence 404(b), this evidence was used to establish propensity and bad character, rather than knowledge or motive.

24

We review for "clear abuse of discretion" a district court's choice to admit evidence under Rule 404(b). *United States v. Sterling*, 738 F.3d 228, 234 (11th Cir. 2013), *cert. denied*, 134 S. Ct. 2682 (2014) (internal quotation marks omitted).

Evidence of prior crimes is admissible under 404(b) as long as (1) it is "relevant to an issue other than defendant's character," (2) the government has introduced "sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question," and (3) the probative value of the evidence is not "substantially outweighed by undue prejudice." *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007).

In concluding that the evidence satisfied these three requirements, the court did not clearly abuse its discretion. First, Beauplant's defense, as presented in Rolle's testimony, was that he was merely a stowaway and lacked the knowledge that there were drugs on the boat and thus the intent to smuggle them. The agent's testimony was relevant as tending to prove Beauplant's knowledge that drugs were present and that he intended to smuggle them. The fact that he was previously arrested for captaining a boat used to smuggle drugs makes his defense less plausible, because it makes it more likely that Beauplant could recognize when a boat is smuggling drugs. Second, the DEA agent's testimony was sufficient to prove Beauplant's prior involvement in smuggling by a preponderance of the evidence. Captains are in a "special position to know of the vessel's contents,"

25

*United States v. Garate-Vergara*, 942 F.2d 1543, 1548 (11th Cir. 1991), *amended sub nom. United States v. Lastra*, 991 F.2d 662 (11th Cir. 1993) (per curiam), and the jury could infer that because Beauplant was the captain of the earlier boat he knew that the boat was carrying drugs. And, third, the probative value of the evidence to show Beauplant's knowledge and intent was not substantially outweighed by its prejudice. Moreover, the district court's standard limiting instruction mitigated whatever prejudice may have resulted from the admission of evidence. *Edouard*, 485 F.3d at 1346.

Accordingly, the defendants' **CONVICTIONS** are **AFFIRMED**.

JORDAN, Circuit Judge, concurring, in which WALKER, Circuit Judge, joins:

As the court explains, *United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991), allows the government, in its case-in-chief at trial, to use the post-arrest/pre-*Miranda*[1] silence of a defendant as substantive evidence of guilt. We are bound by *Rivera,* but its reading of the Fifth Amendment is misguided and should be reconsidered en banc in an appropriate case.

\* \* \* \* \* \* \* \* \*

Just before midnight on May 3, 2014, about 25 nautical miles from Haiti, Coast Guard officers approached Nathaniel Rolle's boat with their firearms drawn. The officers ordered the boat's occupants, including Mario Wilchcombe and Alteme Beauplant, to get on their knees with their hands behind their heads (and later with their hands on the gunnel of the boat). The officers also told the men on the boat that they were not free to move around and made it clear to them that they "had no intent on having a conversation at that point." D.E. 175 at 333.

Several hours later, after the Coast Guard had received authorization to board, and after the boat was searched, the officers put the occupants in leg irons and transferred them to a Coast Guard vessel. The occupants were told to write down their names, dates of birth, and nationalities on cards and were then photographed holding those cards. After about two to three days, the occupants,

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

27

still shackled, were taken to a second Coast Guard vessel.  They arrived in Miami after five days at sea.

The Coast Guard officers never told Mr. Wilchcombe and Mr. Beauplant that it was permissible for them to speak, and did not give them *Miranda* warnings. Mr. Wilchcombe and Mr. Beauplant were not questioned by the officers, and aside from asking if they could have food and water, they did not speak (or ask to speak) to the Coast Guard officers while at sea.  While on the second Coast Guard vessel, Mr. Beauplant told a Creole interpreter that he was from Haiti, that he had been stranded on one of the islands, and that the Bahamians on the boat had offered him a ride home.

Mr. Wilchcombe and Mr. Beauplant did not testify at trial.  The government, in its case-in-chief and over defense objection, elicited from several of the Coast Guard officers that Mr. Wilchcombe and Mr. Beauplant did not say anything to them while in custody aboard the Coast Guard vessels and that they did not ask to speak to any of the officers in private.  The district court denied defense motions for mistrial based on the testimony pertaining to their post-arrest/pre-*Miranda* silence.

In its initial closing argument, the government argued to the jury that, had the two men not been involved in the drug-smuggling venture, they would have said something to the Coast Guard officers after they were arrested and while they

28

were at sea.  The government also returned to the post-arrest silence of Mr. Wilchcombe and Mr. Beauplant in its rebuttal closing argument, telling the jury that, although the Coast Guard officers did not ask the men any questions, they were able to make statements if they wished, as shown by Mr. Beauplant's conversation with the Creole interpreter.

* * * * * * * * *

About 50 years ago, the Supreme Court held that comments by the prosecution and instructions by the trial court on inferences which can be drawn from a defendant's failure to testify at trial violate the Fifth Amendment, even if the jury is also instructed that a defendant has a constitutional right to not take the stand in his own defense:

> It is in substance a rule of evidence that allows the State a privilege of tendering to the jury for its consideration the failure of the accused to testify.  No formal offer of proof is made as in other situations; but the prosecutor's comment and the court's acquiescence are the equivalent of an offer of evidence and its acceptance.

*Griffin v. California*, 380 U.S. 609, 613 (1965).  The Court explained that "[c]omment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' which the Fifth Amendment outlaws."  *Id.* at 614 (citation omitted).  The Fifth Amendment, the Supreme Court concluded, "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.* at 615.

29

A decade later, the Supreme Court explained that "*Griffin* prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt." *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976). So, "[w]here the prosecutor, on his own initiative asks the jury to draw an adverse influence from a defendant's silence, *Griffin* holds that the privilege against self-incrimination is violated." *United States v. Robinson*, 485 U.S. 25, 32 (1988).[2]

As I see it, the government here did what the Fifth Amendment, as interpreted in *Griffin*, forbids. It elicited testimony about the post-arrest silence of Mr. Wilchcombe and Mr. Beauplant in its case-in-chief, and then suggested to the jury in closing argument that their silence should be considered as substantive evidence of guilt.

*Rivera*, citing only to *Fletcher v. Weir*, 455 U.S. 603, 607 (1980), held that "the government may comment on a defendant's silence when it occurs after arrest, but before *Miranda* warnings are given," *Rivera*, 944 F.2d at 1568. *Fletcher*, however, cannot bear the weight *Rivera* placed on it.

---

[2] I recognize that *Griffin* has its critics. *See, e.g.*, *Mitchell v. United States*, 526 U.S. 314, 331 (1999) (Scalia, J., dissenting); Albert Alschuler, "A Peculiar Privilege in Historical Perspective," in **THE PRIVILEGE AGAINST SELF-INCRIMINATION: ITS ORIGINS AND DEVELOPMENTS** 199-202 (1997). But it also has its supporters. *See, e.g.*, **AKHIL REED AMAR, THE CONSTITUTION AND CRIMINAL PROCEDURE: FIRST PRINCIPLES** 52, 73-74 (1997); Stephen J. Shulhofer, *Some Kind Words for the Privilege Against Self-Incrimination*, 26 **U. VA. L. REV.** 311, 330-35 (1991). More importantly for us, however, *Griffin* has not been overruled, and remains binding precedent.

First, *Fletcher* was decided under the "fundamental fairness" standard of the Due Process Clause of the Fourteenth Amendment, and not under the Self-Incrimination Clause of the Fifth Amendment. *See Fletcher*, 455 U.S. at 602, 607. Due process (whether of the Fifth or Fourteenth Amendment varieties) and the privilege against self-incrimination (located in the Fifth Amendment) "are not co-extensive, nor do they have the same underlying rationales. There is, therefore, no principled reason . . . [for the] application of a due process analysis to an inquiry about the privilege against self-incrimination." Maria Noelle Berger, *Defining the Scope of the Privilege Against Self-Incrimination: Should Prearrest Silence be Admissible as Substantive Evidence of Guilt?*, 1999 **U. ILL. L. REV.** 1015, 1025.

Second, *Fletcher* addressed the use of silence to impeach a defendant during cross-examination, and not the use of silence in the government's case-in-chief. It held that the due process clause—as interpreted in *Doyle v. Ohio*, 426 U.S. 610 (1976)—permitted the use of post-arrest/pre-*Miranda* silence on cross-examination of a defendant who took the stand at trial: "In the absence of the sort of affirmative assurance embodied in the *Miranda* warnings, we do not believe it violates due process of law for a State to permit cross-examination as to post[-]arrest silence when a defendant chooses to take the stand." *Fletcher*, 455 U.S. at 607. Later cases have explained that *Fletcher* was decided on due process grounds using a "fundamental fairness" standard. *See, e.g.*, *Wainright v. Winfield*, 474 U.S. 284,

31

290 (1988) ("Since *Fletcher* . . . we have continued to reiterate our view that *Doyle* rests on 'the fundamental unfairness of implicitly assuring a subject that his silence will not be used against him and then using that silence to impeach an explanation offered at trial.'") (citation omitted).  Here, of course, we are not dealing with the use of silence for impeachment during a defendant's cross-examination.

* * * * * * * * *

Although the Supreme Court has held that a voluntary custodial statement taken in violation of *Miranda* may be used on cross-examination to impeach a testifying defendant, the rationale for this rule is that a defendant who testifies at trial, and who places his credibility on the line, cannot use the Fifth Amendment as "a shield against contradictions of his untruths."  *Harris v. New York*, 401 U.S. 222, 224 (1971) (citation and internal quotation marks omitted).  *See also id.* at 226 ("The shield of *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.").  Significantly, when evidence is offered in this manner, it is probative not of the defendant's guilt but of his credibility.  The two factual premises underlying the *Harris* rationale—(1) a defendant who makes a statement to the police, and (2) then testifies in a way that contradicts that statement—are missing here.  Mr. Wilchcombe and Mr. Beauplant made no statements to the

32

Coast Guard officers in the five days they were in custody, and did not testify at trial.

I agree with what Judge Sentelle wrote for the D.C. Circuit in holding that the Fifth Amendment prohibits the government from using post-arrest/pre-*Miranda* silence as substantive evidence of guilt in its case-in-chief:

> [N]either *Miranda* nor any other case suggests that a defendant's protected right to remain silent attaches only upon the commencement of questioning as opposed to custody. While a defendant who chooses to volunteer an unsolicited admission or statement to the police before questioning may be held to have waived the protection of that right, the defendant who stands silent must be treated as having asserted it.

*United States v. Moore*, 104 F.3d 377, 385 (D.C. Cir. 1997).

If there is going to be a trigger for the constitutional protection of silence, that trigger should be custody and not the recitation of *Miranda* warnings. The right to remain silent comes from the Fifth Amendment, not *Miranda*, and exists independently of *Miranda* warnings. *See United States v. Patane*, 542 U.S. 630, 641 (2004) (plurality opinion) (explaining that *Miranda* warnings "protect[ ]" the fundamental right secured by the Self-Incrimination Clause of the Fifth Amendment). Accordingly, "[i]t simply cannot be the case that a citizen's protection against self-incrimination only attaches when officers recite a certain litany of his rights." *Moore*, 104 F.3d at 385.

33

But if we want to talk about *Miranda*, that decision contains broad language which supports the view that it is custody that matters when the issue is the use of a defendant's silence as substantive evidence: "[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of an accusation." *Miranda*, 384 U.S. at 468 n.37.

The Court in *Miranda* also made clear that the warning was just that: a warning that informs the suspect of the privilege against self-incrimination that he already possesses while in police custody and of the consequences of forgoing it. *See id.* at 469 ("The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest."). Nothing in *Miranda* suggests that the warning is the source of the right to remain silent. It thus makes no sense to conclude, as *Rivera* did, that

34

whether a defendant possesses the privilege against self-incrimination is derived from issuance of the warning and not whether he is in custody. Even Justice Scalia, a critic of *Griffin*, viewed *Miranda* as a broad prohibition against the use of post-arrest silence by the government in its case-in-chief. *See Mitchell*, 526 U.S. at 338 n.2 ("[W]e did say in *Miranda* . . . that a defendant's post-arrest silence could not be introduced as substantive evidence against him at trial.").

\* \* \* \* \* \* \* \* \*

In this case the Coast Guard officers chose not to give *Miranda* warnings to Mr. Wilchcombe and Mr. Beauplant while they were kept in shackles for five days at sea, and after they were told that the officers were not interested in having a conversation. In my view, the Fifth Amendment's privilege against self-incrimination did not permit the government to use the post-arrest silence of Mr. Wilchcombe and Mr. Beauplant—neither of whom testified at trial—as substantive evidence of their guilt in its case-in-chief. *Cf. United States v. Hale*, 422 U.S. 171, 176 (1975) (federal case decided on evidentiary grounds: "In most circumstances silence is so ambiguous that it is of little probative force.").

I join Judge Walker's opinion for the court with the hope that, one day, we will revisit *Rivera*.[3]

---

[3] Given the other evidence presented against Mr. Wilchcombe and Mr. Beauplant, I do not think this case is a good vehicle for en banc reconsideration of *Rivera*.