[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-13673
Non-Argument Calendar
_____

D.C. Docket No. 0:14-cr-60058-JEM-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

HUGO JEAN-JOSEPH,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(April 19, 2017)

Before TJOFLAT, WILLIAM PRYOR, and JULIE CARNES, Circuit Judges.

PER CURIAM:

After a four-day trial, a jury found Defendant Hugo Jean-Joseph guilty of eleven counts of willfully aiding or assisting in the preparation of false or fraudulent income tax returns presented to the Internal Revenue Service (IRS), in violation of 26 U.S.C. § 7260(2).  Defendant now appeals that conviction, arguing that the Government failed to present sufficient evidence from which the jury could return a guilty verdict.  We disagree, and AFFIRM the criminal conviction.

## I.    BACKGROUND

Defendant was the president and owner of Lakay Multi Services (LMS), a Florida business that prepared and electronically filed income-tax returns on behalf of its clients.  LMS had three offices in Florida: one in Naples, one in Pompano Beach, and one in Fort Meyers.  Defendant frequently worked out of the Naples office, while the vice president of the company, Guencia Piard (a/k/a Guencia Toussaint) worked out of the Pompano Beach office.  The tax returns at issue in this case came from clients who had visited the Naples office.

To operate this business, Defendant applied for and received three Electronic Filing Identification Numbers (EFINs) which permitted him to electronically file tax returns on behalf of LMS clients—one EFIN for each office.  All of the tax returns at issue in this case were electronically filed by LMS using Defendant's Naples EFIN.

According to witnesses who had visited the Naples office, there appeared to be three employees working at the office during the relevant period—Defendant, Defendant's daughter, and another female employee.  When clients came to LMS Naples to have their tax returns completed, they would provide their W-2s and other relevant documents to one of the employees, sometimes speak with Defendant or one of the other employees, and then return a few days later to retrieve a copy of their submitted return and/or refund check.

As was made clear at trial, however, these completed returns were untruthful in two important respects.  First, the returns that were transmitted to the IRS from the LMS Naples office contained a number of false deductions that were based on alleged expenses not asserted by the clients or drawn from the clients' tax documents.  Second, for some clients, the copies of the tax returns and the refund checks provided to the clients contained a smaller refund amount than the tax returns that were actually transmitted to the IRS.  In other words, LMS would submit false tax returns without the knowledge or consent of the clients in order to create larger refund amounts.  Then, LMS would provide the clients with a copy of the return and a refund check that reflected a lower dollar amount than what was submitted to the IRS.  This allowed LMS to skim the extra money off the top and acquire a fraudulent profit.  In short, LMS misled both the IRS and its own clients.

3

On appeal, Defendant does not contest that there was sufficient evidence introduced at trial to prove this fraudulent income-tax scheme.  Instead, Defendant contends that there was insufficient evidence to prove that *he personally* was involved in creating the fraudulent tax returns transmitted to the IRS.

We review challenges to the sufficiency of the evidence supporting a criminal conviction *de novo*, and view the evidence in the light most favorable to the government.  *United States v. Wilchcombe*, 838 F.3d 1179, 1188 (11th Cir. 2016).  "The issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt.  We will not overturn a jury's verdict if there is any reasonable construction of the evidence that would have allowed the jury to find the defendant guilty beyond a reasonable doubt."  *United States v. Martin*, 803 F.3d 581, 587 (11th Cir. 2015) (citations, quotations, and alterations omitted).  Finally, we "assume that the jury made all credibility choices in support of the verdict and accept all reasonable inferences that tend to support the government's case."  *Wilchcombe*, 838 F.3d at 1188.

## II.    DISCUSSION

Under 26 U.S.C. § 7206(2), any person who "[w]illfully aids or assists in, or procures, counsels, or advises the preparation or presentation" of an income tax return "which is fraudulent or is false as to any material matter" shall be guilty of a felony.  26 U.S.C. § 7206(2).  Once again, Defendant does not contest that the

4

income tax returns at issue were fraudulent; instead, Defendant argues that there was insufficient evidence that he willfully aided, assisted, procured, counseled, or advised the preparation or presentation of these fraudulent income tax returns. Defendant makes three arguments in support of this contention.

First, Defendant emphasizes that, as acknowledged by the prosecution's IRS court-witness coordinator ("coordinator"),[1] the existence of Defendant's EFIN on a given tax return does not necessarily mean that Defendant was the person who completed that return. That is true, but Defendant's conviction was not based only on the fact that fraudulent tax returns were filed under his EFIN. Instead—as explained below—there was a significant body of other evidence supporting the conclusion that Defendant was involved in the preparation of the fraudulent income tax returns. And, of course, the fact that Defendant's EFIN appeared on every tax return in this case certainly supports the jury's conclusion that he was involved in their preparation. As the IRS coordinator testified, the owner of an EFIN "is responsible for the maintenance of the EFIN and all of the returns that are filed with the IRS through that EFIN." As such, this individual is supposed to see "that all the returns that are coming to the IRS are filed in the correct way." The fact that every false tax return in this case bore Defendant's EFIN might not conclusively prove that Defendant physically prepared each return; but it certainly

---

[1] An IRS court-witness coordinator is a custodian of records who is responsible for retrieving IRS documents, certifying these documents, and testifying about these documents in court.

supports an inference that Defendant was involved, in some capacity, in their creation.

Second, Defendant points to the testimony of his daughter, who worked at LMS for three years and who testified that Defendant did not actually prepare any tax returns for LMS. Instead, the daughter explained, the tax information was all sent to Guencia Piard in the Pompano Beach office, who would prepare the tax returns, electronically file them, and then send copies back to the Naples office for distribution to the clients. It was within the province of the jury, however, to disbelieve or discredit the daughter's testimony, especially in light of her familial relation to Defendant. *See United States v. Prince*, 883 F.2d 953, 959 (11th Cir. 1989). Indeed, the Government presented evidence that contradicted the daughter's account of LMS's operations. Specifically, a former employee of LMS testified that Defendant did sometimes prepare tax returns created at the LMS offices.

Defendant's final argument is that there was no direct evidence of his involvement in the scheme because none of the witnesses who had tax returns completed at LMS Naples could specifically say that the witness actually saw Defendant prepare his or her returns. Despite the lack of direct evidence, however, "[c]ircumstantial evidence can be and frequently is more than sufficient to establish guilt beyond a reasonable doubt." *United States v. Henderson*, 693 F.2d

1028, 1030 (11th Cir. 1983); *see also United States v. Doe*, 661 F.3d 550, 560 (11th Cir. 2011) ("The test for sufficiency of evidence is identical regardless of whether the evidence is direct or circumstantial, and no distinction is to be made between the weight given to either direct or circumstantial evidence" (quoting *United States v. Mieres-Borges*, 919 F.2d 652, 656–57 (11th Cir. 1990)).  After reviewing the trial record in this case, we conclude that there is more than sufficient evidence from which the jury could conclude beyond a reasonable doubt that Defendant was involved in the creation of the fraudulent returns.

To begin with, even if Ms. Piard prepared the tax returns at issue in this case, the jury could still reasonably infer that Defendant aided, assisted, procured, counseled, or advised the preparation or presentation of these returns, given the close personal and professional relationship between Ms. Piard and Defendant.  On the professional side, Defendant and Ms. Piard were co-owners of LMS, and the two ran the business together.  On the personal side, the two were involved in an intimate relationship, lived together, and had a child together.  Indeed, during the cross examination of one of the Government's witnesses, Defendant elicited the acknowledgement that Piard had been charged with similar conduct in this same case and was now serving time, after having pled guilty to a conspiracy count.[2]

---

[2]  Defendant was also charged with conspiracy, but the jury acquitted Defendant of this count.

Further, there was evidence that the profits from LMS's fraudulent tax scheme were being deposited into accounts owned by Defendant. Having compiled a summary of bank accounts into which LMS's electronic filing fees and preparation fees were deposited, IRS Special Agent Melissa Tweet testified that for the three tax years at issue in this case—2006, 2007, and 2008—fees were deposited into accounts in which Defendant was either the sole signatory or a co-signatory with Piard.[3]

For tax year 2006, $183,853 was deposited from LMS Naples into an account in which Defendant was the sole signatory. For tax year 2007, $375,605 was deposited from LMS Naples into an account in which Defendant was the sole signatory. For tax year 2008, $5,243 was deposited from LMS Naples into an account in which Defendant was the sole signatory. Although $178,335 was deposited into an account in which Piard[4] was the sole signatory, $80,000 was transferred shortly thereafter from this Piard account to Defendant's account. As for the Fort Meyers and Pompano Beach offices, fees collected from those offices were deposited into two different accounts in which both Defendant and Piard were signatories. Taken together, except for the 2008 deposit into an account in which only Piard was a signatory (and from which an $80,000 transfer was later

---

[3] A bank account's signatories are the individuals who sign an account's signature card and are therefore allowed to withdraw money and write checks from the account.

[4] The account was in the name of "Guencia Toussaint doing business as Rosemary Grocery," but there is no dispute that Guencia Toussaint and Guencia Piard are the same person.

made to Defendant's account), all of the fees collected by LMS Naples during the relevant tax years were deposited into a bank account owned only by Defendant. Fees collected from the other offices were deposited into accounts in which Defendant and Piard were joint signatories.

Additionally, testimony of the various witnesses who had their tax returns completed at LMS Naples, and whose fraudulent tax returns formed the basis of this case, strongly supports an inference that Defendant was involved in the preparation of their income tax returns. According to these witnesses, LMS Naples was a small operation and it was Defendant who appeared to be in charge and to be the person with the tax expertise. Various witnesses testified that they met with Defendant and provided their tax documents to him, and in some cases Defendant talked about specific tax issues with the witness. Indeed, several of these witnesses indicated that their interactions at LMS Naples led them to believe that Defendant would be the person who actually prepared their tax returns.

Specifically, Jacqueline Rodriguez testified that there were only three people working in the office that she visited: Defendant, Defendant's daughter, and a receptionist. In 2007, Ms. Rodriguez met directly with Defendant and provided him with her W-2s. Defendant reviewed these documents, began typing information from the documents into the computer, and specifically asked Ms. Rodriguez about why she chose to have the IRS withhold as much money as she

9

did.  In 2008, Ms. Rodriguez met with Defendant's daughter, but during the course of this meeting Defendant came over to assist the daughter when she was entering information into the computer.  Each year, Ms. Rodriguez was asked to return to the office a few days later to pick up her completed tax return.  Finally, Ms. Rodriguez testified that Defendant appeared to be the one running the office and appeared responsible for the preparation of her tax return.  Further, she had never heard of Guencia Piard or Guencia Toussaint.

Lendsford Blackwood similarly testified that each year he provided his documents directly to Defendant, and thereafter he or his ex-wife would then return to pick up the completed form.  Mr. Blackwood did not recall whether Defendant said that he would personally prepare the returns, but it was his "impression" that Defendant was going to be doing so.  Mr. Blackwood likewise had never heard of Guencia Piard or Guencia Toussaint.

Maria Amaro testified that in 2006, 2007, and 2008 she left her tax documents with Defendant, and returned at a later time to receive her completed return.  The first time Ms. Amaro went to LMS, she dealt only with Defendant, who told her that he was going to prepare her tax returns and estimated the refund he anticipated she would receive.  According to Ms. Amar, Defendant appeared to be in charge of the LMS office, and she specifically confirmed that Defendant's

name, "Hugo Jean-Joseph," appeared in the location for the "preparer's signature" on her 2006 and 2008 returns.[5]

Jean Napolean testified that the first time he went to LMS in 2007 (tax year 2006), he met with a woman who prepared his paperwork, and he then met with Defendant for 30 to 45 minutes. Defendant made small talk with Mr. Napolean during this meeting, but Defendant also asked Mr. Napolean specific tax-related questions concerning his number of dependents and specific expenses. Mr. Napolean testified that he did not meet with Defendant on the following year, but that Defendant was the contact person at LMS and appeared to be the boss. When reviewing his 2006 tax year return, Mr. Napolean also pointed out that Defendant was listed as the "paid preparer" on the tax return.

Fanel Cadet testified that he was told that sometimes the tax documents are sent to LMS's headquarters in a different location and that the tax returns are prepared there. However, Mr. Cadet also recalled that he met Defendant and gave Defendant his tax documents the first time he went to LMS. He believed that his 2006 return was completed by Defendant and that the 2007 and 2008 returns were completed by Defendant's daughter or the other female in the office. Like other

---

[5] Notably, Defendant was *not* listed as the preparer of every tax return completed by LMS. Other tax returns that did not form the basis of the charges against Defendant listed Guencia Toussaint or Guencia Piard as the paid preparer.

witnesses, Cadet confirmed that both the 2006 and 2008 tax returns listed the defendant, "Hugo Jean-Joseph," as the preparer.

Finally, Elima St. Louis testified that although he did not meet with Defendant when he first came to LMS, he picked up his tax return from Defendant and believed that Defendant prepared his taxes returns. Like other witnesses, Mr. St. Louis pointed out that "Hugo Jean-Joseph" was named as the preparer of his 2006 and 2008 tax returns. Also like other witnesses, Mr. St. Louis testified that he did not know either Guencia Piard or Guencia Toussaint.

Taken together, there was sufficient evidence presented at trial from which the jury "reasonably could have found guilt beyond a reasonable doubt." *Martin*, 803 F.3d at 587 (internal quotation marks omitted). Importantly, the jury was not required to conclude that Defendant was the sole or primary preparer of the fraudulent tax returns. Instead, it only needed to conclude that he willfully aided, assisted, procured, counseled, or advised either the preparation or presentation of the fraudulent tax returns. *See* 26 U.S.C. § 7206(2). Further, "[t]he evidence need not be inconsistent with every reasonable hypothesis other than guilt, and we allow the jury to choose among several reasonable conclusions to be drawn from the evidence." *United States v. Hunt*, 526 F.3d 739, 745 (11th Cir. 2008). Defendant was the owner and president of a small company that was transmitting fraudulent tax returns; all the returns bore Defendant's EFIN; the only other potential preparer

12

was in a close personal and professional relationship with Defendant; Defendant controlled the bank accounts in which the profits of the scheme were deposited; and clients interacted with Defendant at the Naples office and believed that he was going to be the one preparing their returns.  Considering all this evidence, there was ample evidence to support the jury's guilty verdict on the eleven counts it so specified.

## III.   CONCLUSION

The jury's verdict of guilt was supported by sufficient evidence.  Therefore, Defendant's conviction is **AFFIRMED**.