[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-10810

_____

D.C. Docket No. 1:13-cr-20911-BB-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ELDER NEHEMIAS LOPEZ HERNANDEZ,
SAULO ARAHON HERNANDEZ ALMARAZ,
JOSE LUIS AGUILAR LOPEZ,
SAMUEL SAVALA CISNEROS,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 28, 2017)

Before HULL, MARCUS, and ROGERS[*], Circuit Judges.

ROGERS, Circuit Judge:

_____

[*] Honorable John M. Rogers, United States Circuit Judge for the Sixth Circuit, sitting by designation.

The United States prosecuted these four defendants—Lopez Hernandez, Hernandez Almaraz, Aguilar Lopez, and Savala Cisneros—under the Maritime Drug Law Enforcement Act (MDLEA), which criminalizes an individual's possessing with intent to distribute a controlled substance "[w]hile on board a covered vessel," which includes "a vessel subject to the jurisdiction of the United States," which in turn includes "a vessel without nationality." 46 U.S.C. §§ 70502(c)(1)(A), 70503(a)(1), (e)(1) (2012). The U.S. Coast Guard arrested the four defendants on board the *Cristiano Ronaldo*, which the defendants claimed was registered in Guatemala—and claimed so truthfully, as it later turned out. Shortly before the search of the ship, however, when asked by the Coast Guard, the Guatemalan government could neither confirm nor deny the ship's registry. The parties proceeded to trial. The Government presented evidence that the defendants threw overboard about 290 kilograms of cocaine shortly before arrest. The jury convicted all four defendants of every indicted crime.

On appeal, the defendants argue primarily that the *Cristiano Ronaldo* was not "a vessel without nationality" because the vessel was properly registered in Guatemala, as the U.S. Coast Guard should have been able to determine with the information that it had. But the *Cristiano Ronaldo* fit within the MDLEA's broad definition of a "vessel without nationality" because a designee of the U.S. Secretary of State has certified, and thereby "proved conclusively," that Guatemala

2

had not "affirmatively and unequivocally" asserted that the *Cristiano Ronaldo* was of Guatemalan nationality.  Under the clear terms of the MDLEA, that certification put the crime within the territorial coverage of the statutory prohibition.  The executive branch thereby effectively assumed responsibility for any diplomatic consequences of the criminal prosecution.  The defendants' other arguments— insufficient evidence, prosecutorial misconduct, improper suppression or loss of evidence, erroneous admission of hearsay, and misapplication of two sentencing enhancements—are also without merit.

## I.

On November 5, 2013, the U.S. Coast Guard identified a suspicious go-fast vessel in international waters, about 120 nautical miles southwest of the El Salvador/Guatemala border, in the Pacific Ocean.  The vessel was not flying any national flag.  When a Coast Guard helicopter approached it, the vessel sped off, despite radio-transmitted orders in English and in Spanish to halt, and despite several warning shots into the water.  The Coast Guard fired at the *Cristiano Ronaldo*'s engines, immobilizing the vessel.  Crewmen on the vessel then began dumping black packages overboard.

Officers of the Coast Guard boarded the *Cristiano Ronaldo* and ultimately arrested the four crewmen—the four defendants in this case.  When the Coast Guard officers boarded the ship, Hernandez Almaraz said he was its captain.  He

3

also said he was a Guatemalan citizen, as did the other three crewmen.  He claimed

that the *Cristiano Ronaldo* was registered in Guatemala.  Soon thereafter, the Coast

Guard contacted the Guatemalan government to confirm or deny the claim of

registry.  The Guatemalan government responded that it "could neither confirm nor

deny."  The Coast Guard proceeded to search the ship.

What happened during the intervening period—the period after Hernandez

Almaraz claimed the ship's registry in Guatemala but before the Coast Guard

contacted the Guatemalan government to check that claim—is unclear.

The Coast Guard states, "No registration documentation was provided to or

located by United States law enforcement personnel."  That may have been true

when the Coast Guard asked the Guatemalan government about the ship's registry,

but the Coast Guard later found registration documents on the ship, as the United

States ultimately provided the documents to the defendants during discovery.

Some of the defendants claim, or at least suggest, that the Coast Guard had

the registration documents before it asked Guatemala about the *Cristiano

Ronaldo*'s registry.  In support of the motion to dismiss the indictment, Aguilar

Lopez wrote, "As soon as *Cristiano Ronaldo* was boarded by the U.S. Coast

Guard, [Hernandez Almaraz] gave the Coast Guard a document, issued by the

Guatemalan Navy, certifying that *Cristiano Ronaldo* is registered as a Guatemalan

vessel."  On appeal, Savala Cisneros states that "once the *Cristiano Ronaldo* was

4

boarded by the U.S. Coast Guard, [Hernandez Almaraz] gave the Coast Guard [the registration] document."

Later, the Coast Guard retrieved some packages where the defendants had thrown packages overboard. The retrieved packages contained about 290 kilograms of cocaine, valued contemporaneously on the streets at about $8.7 million.

Some of the evidence from the scene was lost. The *Cristiano Ronaldo* was accidentally sunk when Coast Guard officers, during a standard "At Sea Space Accountability" procedure, drilled holes in the *Cristiano Ronaldo* to check if there were hidden compartments; they used putty to cover the holes, but water nevertheless began pouring into the ship. The wet clothes that the defendants were wearing that day were discarded because of concerns of mold. Similarly, and out of the same concern, the burlap sacks that had covered the cocaine packages were discarded.

Before trial, the district court rejected the defendants' motion to dismiss for lack of jurisdiction, and granted the Government's motion to determine that the vessel was subject to the jurisdiction of the United States. The court relied on the certification from Commander Salvatore J. Fazio of the U.S. Coast Guard, as designee of Secretary of State John Kerry, which declared that Hernandez Almaraz claimed the *Cristiano Ronaldo*'s Guatemalan registry, and that the Guatemalan

5

government could neither confirm nor deny that claim.  The district court specifically declined to inquire into "the factual underpinnings of the certificate" because the court reasoned that they were "neither relevant or appropriate" under the MDLEA.  In the same order, the district court denied the motion to reconsider its previous order granting the Government's motion to quash the subpoena to Commander Fazio.

The parties proceeded to a four-day jury trial.  The Government's trial evidence included the testimony of Officer Arambula of the U.S. Coast Guard about the actions and statements of his colleague Officer Ligsay.  The closing arguments were somewhat heated, with the Government calling the defense attorneys "spin doctors," for example.

The jury convicted all four defendants of all indicted crimes.

The district court sentenced Lopez Hernandez, Savala Cisneros, and Aguilar Lopez to 188 months' imprisonment.  The district court sentenced Hernandez Almaraz to 200 months' imprisonment, applying to him two sentencing enhancements related to his role as the captain of the *Cristiano Ronaldo*.

## II.

The district court properly determined that the *Cristiano Ronaldo* was a vessel within the jurisdiction of the United States because it was a "vessel without

nationality" within the meaning of the plain text of the MDLEA.  Such a vessel is statutorily defined to include:

> [A] vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

46 U.S.C. § 70502(d)(1)(C).    Defendants essentially challenge whether the terms of this provision have been met, but the Government has proved conclusively that they have.  The Government produced the written certification of Commander Salvatore J. Fazio of the U.S. Coast Guard, in which Commander Fazio declared that: (i) the self-identified master of the *Cristiano Ronaldo* claimed that the ship was registered in Guatemala; (ii) the U.S. government asked the Guatemalan government to confirm or deny the vessel's registry; and (iii) the Guatemalan government responded that it "could neither confirm nor deny that the go-fast vessel was registered in Guatemala."  As Commander Fazio further stated, "Accordingly, the Government of the United States determined the vessel was without nationality in accordance with 46 U.S.C. § 70502(d)(1)(C), rendering the vessel subject to the jurisdiction of the United States [under the MDLEA]."  Commander Fazio's certification was accompanied by a certificate by Secretary of State John Kerry designating Commander Fazio to act on the part of the Department of State.  The MDLEA specifies that "[t]he response of a foreign

7

nation to a claim of registry . . . is proved conclusively by certification of the Secretary of State or the Secretary's designee." *Id.* § 70502(d)(2). Because Commander Fazio is an appropriate designee of the U.S. Secretary of State, under the plain text of the MDLEA, his certification conclusively proves that the Guatemalan government responded that it "could neither confirm nor deny" the *Cristiano Ronaldo*'s registry. That response, in turn, unambiguously means that Guatemala did not at the time "affirmatively and unequivocally assert" the ship's registry. *Id.* § 70502(d)(1)(C). The absence of such an assertion rendered the *Cristiano Ronaldo* a "vessel without nationality," *id.* § 70502(d)(1), and thus a "vessel subject to the jurisdiction of the United States," *id.* § 70502(c)(1)(A), and therefore a "covered vessel," *id.* § 70503(e)(1), to which the MDLEA's criminal prohibition against possessing a controlled substance with distributary intent extends, *id.* § 70503(a)(1). The district court therefore properly exercised jurisdiction over the defendants under the MDLEA.

To avoid that outcome, the defendants primarily argue that the *Cristiano Ronaldo* was actually registered in Guatemala, that the Coast Guard possessed identifying information about the ship that would easily have confirmed its registry, and that the Coast Guard failed in bad faith to convey that information when it asked the Guatemalan government whether the ship was registered. The defendants' arguments based on actual registry and alleged bad faith fail, both as a

statutory argument about proof of the *Cristiano Ronaldo*'s lack of nationality under the MDLEA, and as an international-law argument about the U.S. government's failure to abide by its treaty promise to the Guatemalan government to convey all available identifying information when asking about a ship's registry.

Interpreted as a statutory jurisdictional argument, the defendants' argument cannot overcome the conclusive-proof provision of the MDLEA. The statute plainly states that the certification conclusively proves the foreign country's response. Here, because the certification conclusively proves that the Guatemalan government "could neither confirm nor deny" the *Cristiano Ronaldo*'s registry, the certification also establishes the fact that Guatemala did not "affirmatively and unequivocally assert" registry. The MDLEA does not state what information the United States must convey to the foreign government during its communication, and it does not state that actual registry overrides the certification's proof of statutory statelessness. MDLEA statelessness does not turn on actual statelessness, but rather on the response of the foreign government. Arguing actual registry against the certification therefore misses the mark.

This conclusion is supported by our decision in *United States v. Campbell*, 743 F.3d 802 (11th Cir. 2014). In that case, as in this case, the Commander of the U.S. Coast Guard (at the time, Commander Deptula) certified in writing that the ship's captain claimed foreign registry, that the Coast Guard asked the foreign

9

government whether the claim was true, and that the foreign government responded that it "could neither confirm nor deny" the claimed registry. *Id.* at 804. The defendant, as in this case, nonetheless challenged the certification's conclusive proof of jurisdiction, arguing "that the certification . . . lacked details about the communications between the Coast Guard and Haiti and that the United States did not offer any testimony to corroborate the certification." *Id.* at 809. We rejected that argument, explaining that the certification's statement "that Haiti responded that it could neither confirm nor deny the registry . . . provided conclusive proof that the vessel was within the jurisdiction of the United States." *Id.* Just as the certification's conclusive proof foreclosed any need for details or corroborations in that case, it also forecloses any inquiry into its veracity in this case.

While in *Campbell* the defendant "stipulated to . . . the representations by the Coast Guard in the certification," *Campbell*, 743 F.3d at 809, and in this case the defendants specifically challenge the statement in the certification that "no registration document was provided to or located by United States law enforcement personnel," the difference triggers no distinction. The very concept of a conclusive proof entails not only that no detail or corroboration is needed, but also that any contrary evidence is futile. If a document states a proposition, a party introduces evidence that contradicts or undermines the proposition, and a court thereby inquires whether the proposition is true, then the court treats the document at most

10

as establishing a rebuttable presumption of the proposition's truth, but not as conclusively proving its truth.  Congress instructs specifically that courts should treat the MDLEA certification as conclusive of the foreign nation's response.

It is true that in two cases relied upon by the defendants, we proceeded past a similar certification to examine whether the U.S. agents acted in good faith when communicating with the foreign government.  *See United States v. Tinoco*, 304 F.3d 1088 (11th Cir. 2002); *United States v. Devila*, 216 F.3d 1009 (11th Cir. 2000).  However, both of those cases are distinguishable because they applied prior versions of the MDLEA, versions without a conclusive-proof provision that applied to the determination in question.  In *Devila*, the defendants were indicted in June 1996, 216 F. 3d at 1012, months before the amendment to the MDLEA on October 19, 1996, that added a conclusive-proof provision, Coast Guard Authorization Act of 1996, Pub. L. No. 104-324, § 1138, 110 Stat. 3901, 3988–89 (1996).  We explicitly rejected a Government assertion that a Secretary of State certification was conclusive proof, applying what was then the law, that such a certification provided only rebuttable prima facie evidence.  *Devila*, 216 F.3d at 1015 n.4.  The applicable version of the MDLEA in *Devila* stated only that "[t]he denial of such claim of registry by the claimed flag nation *may be proved* by certification of the Secretary of State or the Secretary's designee."  46 U.S.C.A. App. § 1903(c)(2) (1996) (emphasis added).  In *Tinoco*, the United States as in the

11

instant case had certified that Colombia "could neither confirm nor deny the verbal claim of Colombian registry," 304 F.3d at 1113, but this was at a time when the conclusive-proof provision applied only to the foreign state's "denial" of registry. 46 U.S.C.A. App. § 70502(d)(2) (2006) ("The denial of such a claim is proved conclusively by certification of the Secretary of State or the Secretary's designee."). The provision was amended in 2006, Coast Guard and Maritime Transportation Act of 2006, Pub. L. No. 109-241, § 303, 120 Stat. 516, 527 (2006), and codified in 2008, National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 3525(a)(6), 122 Stat. 3, 601 (2008), into its current form, which states that the certification conclusively proves "the response" of the foreign nation, no matter whether "the response" is a denial, a non-denial/non-confirmation, or a confirmation. *See generally United States v. Brant-Epigmelio*, 2010 WL 557283, at *5 n.6 (M.D. Fla. 2010) (outlining the two amendments that added the MDLEA's conclusive-proof language).

*United States v. Wilchcombe*, 838 F.3d 1179 (11th Cir. 2016), relied upon by defendants, is also not to the contrary, although it, too, proceeded to analyze good faith, and even though the current version on the MDLEA was in effect. That case arose from slightly different facts. There, the defendant claimed the ship's registry in the Bahamas and the Bahamian government confirmed the ship's registry. *Id.* at 1184. The issue with respect to jurisdiction was therefore whether the Bahamian

12

government thereafter consented to the United States' searching the ship.  A

separate provision of the MDLEA states that that "[c]onsent or waiver of objection

by a foreign nation," too, "is proved conclusively by certification of the Secretary

of State or the Secretary's designee."  46 U.S.C. § 70502(c)(2).  The certification

in that case stated that the Bahamian government so consented.  838 F.3d at 1187.

The defendants there nevertheless argued that "the Coast Guard misled the

Bahamian Government about the documentation of the registration status of [the

boat in question] that was available to the Coast Guard when it was seeking the

[statement of no objection]," and on that ground urged the court to look past the

certification's conclusive proof of consent.  *Id.*  Without deciding whether doing so

was required, we proceeded to do so and concluded that the argument did not

defeat jurisdiction, listing "multiple reasons" why.  *Id.* at 1188.[1]  We did not hold

that the law required looking past the certification's conclusive proof of consent

upon evidence undermining the certification's veracity.  Instead we ruled for the

Government on one alternative basis (no evidence of bad faith or intentional

misrepresentation) rather than on another (the conclusive proof provision).  This

hardly constitutes a holding that rejects the latter.

---

[1] While there is a statement in the *Wilchcombe* opinion that a district court "may take into account" evidence of bad faith or intentional misrepresentation, *id.* (citing *Tinoco*, 304 F.3d at 1114), the statement was based on *Tinoco*, a case which did not apply a conclusive-proof provision, as explained in the preceding paragraph.

13

Any remaining challenge to the way that the Coast Guard communicated with the Guatemalan government effectively asserts a violation of international law, which under the MDLEA is not a defense.  Savala Cisneros relies on an agreement between the U.S. and Guatemalan governments which states that a request for verification of a ship's registry "shall contain the basis for the suspicion [of the ship's illicit activity], the geographic position of the vessel, and, if available the name of the suspect vessel, the registration number, home port, the port of origin and destination, and any other identifying information."  Agreement Concerning Cooperation to Suppress Illicit Traffic in Narcotic Drugs and Psychotropic Substances by Sea and Air, U.S.-Guat., art. VII, § 2, June 19, 2003.[2] However, the MDLEA states that "[a] person charged with violating [the MDLEA] . . . does not have standing to raise a claim of failure to comply with international law as a basis for a defense," explains that that "claim of failure to comply with international law in the enforcement of [the MDLEA] may be made only by a foreign nation," and specifies that "[a] failure to comply with international law does not divest a court of jurisdiction and is not a defense."  46 U.S.C. § 70505. With that text, Congress has instructed: any battle over the United States' compliance with international law in obtaining MDLEA jurisdiction should be

---

[2] *Available at* <http://heinonline.org/HOL/Page?handle=hein.ustreaties/kav06486&start_page= &collection=ustreaties>.

14

resolved nation-to-nation in the international arena, not between criminal

defendants and the United States in the U.S. criminal justice system.  Assuming as

true the defendants' suggestions that they provided the ship's registration

document to the Coast Guard as soon as its officers boarded the ship,[3] assuming

further that the Coast Guard failed in bad faith to convey information in that

document to the Guatemalan government, and assuming finally that that assumed

failure violated the United States' obligation to Guatemala, still the defendants'

international law argument does not touch the conclusion that the United States

properly exercised statutory jurisdiction over this suit.  If the United States hid

information from Guatemala, then the Guatemalan government may complain in

some form to the U.S. government; but Congress has instructed that these

defendants may not litigate those complaints in an MDLEA prosecution.

---

[3] In his motion below to dismiss the indictment, Lopez Hernandez appeared to admit that the Coast Guard found the registration documents after it determined the ship to be stateless.  But on that same motion, Aguilar Lopez wrote, "As soon as *Cristiano Ronaldo* was boarded by the U.S. Coast Guard, [Hernandez Almaraz] gave the Coast Guard a document, issued by the Guatemalan Navy, certifying that *Cristiano Ronaldo* is registered as a Guatemalan vessel."  On appeal, Savala Cisneros states that "once the *Cristiano Ronaldo* was boarded by the U.S. Coast Guard, [Hernandez Almaraz] gave the Coast Guard [the registration] document," without specifying exactly how long after the boarding the tender occurred.  Savala Cisneros also points out that the Coast Guard later produced the registration document to the defense during discovery and argues that that production of the document shows that the Coast Guard had obtained the registration document before it contacted the Guatemalan government for confirmation of registry.  But this does not follow.  The Coast Guard could have obtained the registration document after the communication with the Guatemalan government, during the following search of the vessel, and therefore before discovery.

In his reply brief, Savala Cisneros insists that he "is not contesting the response of the foreign nation, but is instead contesting the facts alleged by the United States in the certification and jurisdiction."[4] Savala Cisneros may simply be insisting that we look beyond what the Guatemalan government is conclusively proven to have said, to the conduct of the U.S. Coast Guard that brought about that response. But the conclusive proof provision does not specify the requisite form of prior notice to the government of the claimed flag nation. To the extent that such prior notice may be required by international law, reliance on such a requirement is not warranted under the MDLEA. Congress explicitly stated: "A failure to comply with international law *does not divest a court of jurisdiction* and is not a defense." 46 U.S.C. § 70505 (emphasis added).

Savala Cisneros may also be arguing that even if the certification conclusively proves the Guatemalan government's response, i.e., that the certification could "neither confirm nor deny" the registry, it does not necessarily follow that the certification also conclusively proves the jurisdictional fact that Guatemala did not "affirmatively and unequivocally assert" registry under 46 U.S.C. § 70502(d)(1)(C). But a non-confirmation/non-denial of registry is necessarily the failure to "affirmatively and unequivocally assert" registry; the

---

[4] Elsewhere in the reply brief, Savala Cisneros claims that he is disputing jurisdiction in particular on the basis of "the false statements the United States government made to Guatemala," or as put elsewhere, "the United [States'] claims outlined in the certification."

16

wording of the Guatemalan response leaves no ambiguity that it was doing something other than "affirmatively and unequivocally assert[ing]" registry. This is particularly true given the certification's explicit reference to the relevant statutory language. To rule otherwise would be to impose an undue and burdensome formality on the content of the Secretary's certification. This conclusion is supported by our decision in *Wilchcombe*, which held that the certification in that case was not required to "precisely mirror" the statutory language. *Wilchcombe*, 838 F.3d at 1186–87.

Savala Cisneros presses two additional arguments related to jurisdiction. Both fail. First, the district court did not commit reversible error in quashing Aguilar Lopez's subpoena to Commander Fazio. Even though the district court granted the Government's motion to quash the subpoena before the defendants had the opportunity to respond to the motion, the error was harmless because the defendants later had the opportunity to respond in their motion to reconsider. In any event, the district court properly reasoned that Commander Fazio did not need to testify because the MDLEA's conclusive-proof provision foreclosed any inquiry into the Commander's communications with the Guatemalan government in determining the *Cristiano Ronaldo*'s MDLEA statelessness. Second, Savala Cisnero's constitutional argument—that the MDLEA is an unconstitutional assertion of Congressional power because it reaches stateless vessels on the high

seas without a proven nexus to the United States—is foreclosed by our precedent. In *Campbell*, we held that the MDLEA was a constitutional exercise of Congressional authority under the Felonies Clause, and that the conduct proscribed by the MDLEA need not have a nexus to the United States. *Campbell*, 743 F.3d at 809–10; *see also Wilchcombe*, 838 F.3d at 1186 (adhering to that conclusion).

## III.

Finally, Aguilar Lopez makes what sounds like a plausible argument:  How can defendants commit a crime on a vessel at a time when it is not yet determined to be a stateless vessel, only to have the vessel meet the statutory requirements for a stateless vessel after the crime has been committed?  By the time the Coast Guard received word from the Guatemalan government that it could neither confirm nor deny the *Cristiano Ronaldo*'s registry, the crewmen had already thrown the packages overboard, and there were no longer any drugs on the ship.  Aguilar Lopez therefore argues that, even under the Government's theory, when the response from the Guatemalan government "converted the Guatemalan vessel into a stateless one," Aguilar Lopez no longer possessed narcotics with intent to distribute, and that the Government has failed to prove that Aguilar Lopez was on board a stateless vessel subject to U.S. jurisdiction when he previously did allegedly possess narcotics with intent to distribute.

18

Aguilar Lopez's insufficiency-of-the-evidence argument fails because whether the statutory requirements for MDLEA jurisdiction have been met is not an element of the crime that the Government must prove beyond a reasonable doubt. "[T]he [MDLEA's] jurisdictional requirement is not an essential ingredient or an essential element of the MDLEA substantive offense, and, as a result, it does not have to be submitted to the jury for proof beyond a reasonable doubt." *Tinoco*, 304 F.3d at 1109–10. Instead, the MDLEA's jurisdictional provisions allocate power between the courts and the executive as to which of the two will be responsible for complying with U.S. obligations under the international law of criminal jurisdiction.

Construed as a challenge to that allocation, Aguilar Lopez's argument fails because, by relying on the certification to exercise MDLEA jurisdiction over this case, we are not holding that the *Cristiano Ronaldo* was stateless under international law at the time of the criminal conduct. We are instead holding, as we need only hold, that the statutory requirements for MDLEA prosecution in U.S. courts have been met, while recognizing that any further jurisdictional complaint over that U.S. prosecution is to be handled by the executive branch, nation-to-nation, in the international arena. There is nothing anomalous about basing *that* decision on actions taken after the criminal activity.

19

Some background helps explain why.  Under international law, a nation may lack power to punish criminally the actions of a foreign citizen outside its territory, such that the nation whose national is tried may protest diplomatically.  These limits are referred to as limits on a nation's jurisdiction to prescribe.  *F.T.C. v. Compagnie De Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1315 (D.C. Cir. 1980).  In addition, under international law a nation may lack power to go on the territory of a foreign state without consent to seize a person, even a national of the seizing state, such that the state whose territory is violated may protest diplomatically.  These limits fall under the rubric of a nation's jurisdiction to enforce.  *Id.* at 1305–06.  *See generally* Restatement (Second) of the Foreign Relations Law of the United States § 6 cmt. a (1965).

In the MDLEA, Congress has delineated between judicial and diplomatic compliance with international law limits on criminal jurisdiction over the actions of aliens on ships on the high seas, with respect to limits on both prescriptive and enforcement jurisdiction.  To the extent that we determine a particular case to be on the diplomatic side of those lines, we are not necessarily saying that the United States could exercise territorial jurisdiction under international law limits, but only that Congress has determined that the question, if there is one, is to be dealt with diplomatically and not by the courts.  On the protest of a foreign nation, for instance, the executive branch can decline to prosecute.  So viewed, there is no

anomaly in finding jurisdiction under the MDLEA based on a Secretary of State certification of a vessel's state's post-crime non-assertion of registry.

## IV.

The defendants' other arguments are also without merit. Despite arguments from Savala Cisneros and Aguilar Lopez to the contrary, sufficient evidence supported the defendants' convictions. Savala Cisneros argues, as he and his co-defendants argued at trial, that they had only been fishing that day and that the bales of cocaine that the Coast Guard recovered from the water had not been thrown from the *Cristiano Ronaldo*. The trial evidence included testimony, for example: (i) that the *Cristiano Ronaldo* was located more than 120 miles offshore, away from any fishing fleet, with essentially no fishing gear, but with a large amount of fuel; (ii) that the *Cristiano Ronaldo* sped off when the Coast Guard helicopter approached, despite the Coast Guard's radio-transmitted orders to halt, and despite several warning shots from the helicopter into the water; (iii) that the crew of the *Cristiano Ronaldo* threw overboard black packages from the boat when the Coast Guard immobilized the vessel; and (iv) that in that marked location the Coast Guard later recovered about ten bales containing about 290 kilograms of cocaine. Viewing the evidence in the light most favorable to the Government and accepting all reasonable inferences in favor of the verdict, *e.g.*, *United States v. Calhoon*, 97 F.3d 518, 523 (11th Cir. 1996), the presented evidence allowed a

reasonable trier of fact to find that the evidence established beyond a reasonable doubt that the four crewmen of the *Cristiano Ronaldo* were smuggling cocaine instead of fishing.  Their intent to distribute the cocaine, moreover, reasonably could have been inferred from the large quantity.  *See, e.g.*, *Tinoco*, 304 F.3d  at 1123 (11th Cir. 2002).

## V.

Contrary to the arguments of Savala Cisneros and Aguilar Lopez, the Government's statements made in closing argument and rebuttal did not constitute reversible prosecutorial misconduct, because they were not sufficiently prejudicial. Some of the challenged remarks do not reflect the high standards to which the Government should hold itself: instead of twice characterizing the defense attorneys as "spin doctor[s]," the Government could have cut to refuting the defense theory; instead of responding eye-for-eye to the defense counsel's statement that the Government's case was "insulting" by calling the defense theory "insulting," the Government could have cut to arguing on the merits why it had proven its case and why the defense had failed to plant a reasonable doubt in it; instead of referring to its witnesses as the "fine men and women of the Coast Guard [who] put their lives on the line every single day," the Government could have highlighted the facts adduced at trial from which the jury could have inferred

their credibility.  Other challenged remarks do not appear improper at all.[5]  In any event, to be reversible error, prosecutorial misconduct must raise a reasonable probability that, but for the prejudicial remarks, the outcome at trial would have been different.  *E.g.*, *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009).  The challenged remarks do not raise that probability both because they are not sufficiently substantive and because of the strength of the Government's evidence supporting the defendants' guilt.

## VI.

Neither the Coast Guard's accidental destruction of the *Cristiano Ronaldo* on the day of arrest, nor the Government's discarding the defendants' clothes and the burlap sacks in which the bales of cocaine were found, violated Savala Cisneros's rights, either under *Brady v. Maryland*, 373 U.S. 83 (1963), or under *Arizona v. Youngblood*, 488 U.S. 51 (1988).  These pieces of evidence were not

---

[5] For example, this remark—"the Government submits to you that Lieutenant Hawn and Petty Officer Brown were extremely credible when they told you what are the priorities"—does not improperly bolster the witnesses' credibility, especially since it was followed directly by arguments why the testimony was credible.  The Government's statement that Savala Cisneros's boarding the *Cristiano Ronaldo* sufficed to support conspiratorial agreement to distribute cocaine was not improper when viewed in the context, which was that, in order for there to be conspiratorial agreement, the members did not have to know every aspect of the plan regarding the cocaine and that the magnitude of any particular defendant's role was not relevant.  The Government's closing remarks that characterized a witness's testimony, regardless of whether they were mischaracterizations, did not amount to reversible impropriety, especially in light of the district court's reminder to the jury to recall the witness's testimony itself.

23

sufficiently exculpatory, particularly in light of the strength of the inculpatory evidence, for the following reasons.

Savala Cisneros first asserts that the *Cristiano Ronaldo* contained fishing equipment, that he was wearing fishing clothes, and that the equipment and his clothes would have shown that he was, in fact, fishing the day he was apprehended by law enforcement. But Savala Cisneros does not specifically allege what fishing equipment was on board the *Cristiano Ronaldo* when it sank, and does not argue how even with fishing equipment and even wearing fishing clothes one cannot also smuggle cocaine. Savala Cisneros next asserts that the precise dimensions of the *Cristiano Ronaldo*'s fish hold would have conclusively established that the large amount of cocaine recovered would not have fit in it. However, the Government introduced a photograph that depicted the four defendants standing in the fish hold, which made the jury aware of its relative size. The loss of the burlap sacks that had covered the bales did not prevent Savala Cisneros from arguing as follows: that the photographs of the bales that had been thrown from the *Cristiano Ronaldo* show yellow tape on the bales, but that the packages of cocaine recovered from the water did not have any yellow markings and therefore did not come from the *Cristiano Ronaldo*. In response, the Government introduced testimony from multiple Coast Guard witnesses that the packages jettisoned from the *Cristiano Ronaldo*, and subsequently recovered by the Coast Guard, were all black.

24

Furthermore, the witness familiar with the camera noted that the coloring could be distorted if the camera was not set up perfectly. Savala Cisneros finally asserts that the vessel would have shown that it did not have a radio, which could have explained why the defendants did not stop the vessel when the Coast Guard radio-transmitted orders to halt. But even putting aside the radio-transmitted orders, at trial, a Coast Guard lieutenant testified that the helicopter he flew in pursuit of the *Cristiano Ronaldo* had an insignia indicating that it was a Coast Guard helicopter. He also testified that one of the helicopter's crew members was waving to the defendants in an attempt to make them stop, and that warning shots were fired near the vessel to stop it.

For both a *Youngblood* claim that the Government failed to preserve potentially useful defense evidence and a *Brady* claim that the prosecution failed to disclose exculpatory evidence, there is a materiality requirement. To warrant reversal, the evidence that the prosecution suppresses under *Brady* must raise "a reasonable probability," i.e., "a probability sufficient to undermine confidence in the outcome," that "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *id.* at 685 (White, J., concurring); *see Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (explaining that evidence is material under *Brady* "when there is a reasonable probability that, had the evidence been disclosed, the result of

25

the proceeding would have been different").  Similarly, to warrant reversal, the unpreserved evidence under *Youngblood* must be the sort of evidence "that might be expected to play a significant role in the suspect's defense."  *California v. Trombetta*, 467 U.S. 479, 488 (1984).  None of the unavailable pieces of evidence that Savala Cisneros points to would have been expected to play a significant role in defense or raise the reasonable probability that the outcome could have been different, not just because the alleged unavailable evidence is insufficiently probative or sufficiently substituted, but also because the evidence of guilt is overwhelming.[6]

   *United States v. Revolorio-Ramo*, 468 F.3d 771 (11th Cir. 2006), confirms this result.  In that case, we affirmed MDLEA convictions and rejected the defendants' argument that their due process rights were violated when the Coast Guard destroyed their vessel after determining the vessel was not seaworthy and could not be towed safely.  *Id.* at 774–75.  There, as here, photographs and a video

---

[6] Savala Cisneros's claims here might also fail for alternative reasons, which we note but do not reach.  His *Brady* claim might fail also because the prosecution never had access to some of the lost evidence.  *Brady* applies only to the suppressed evidence that was available to the prosecution. *United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002).  His *Youngblood* claim might fail also because he failed to prove the Government's bad faith in destroying the evidence.  Unlike in a *Brady* claim, bad faith must be proven in a *Youngblood* claim. *Youngblood*, 488 U.S. at 58.  Here, any argument that the Government acted in bad faith is speculative.  Officer Arambula testified that the *Cristiano Ronaldo* was sunk accidentally despite attempts to prevent it; another agent testified that the clothes and the burlap sacks were wet and therefore discarded due to mold and sanitation concerns.  Savala Cisneros offers no concrete argument that those reasons were pretextual.

had been taken of the boat, but they were poor in quality, and the parties disagreed about the quantity and condition of the fishing equipment on board. *Id.* at 773. We nevertheless determined that any exculpatory evidence aboard the vessel would have, at most, bolstered the arguments already presented to the jury, and would not have allowed the defense to present an otherwise unavailable argument. *Id.* at 774. We emphasized that the defendants had the opportunity to question law enforcement at trial to attempt to raise doubts for the jury. *Id.* at 774-75. Likewise, in this case, Savala Cisneros's claims about the lost evidence, at best, would have merely bolstered the arguments that he made at trial—that he was merely a fisherman, that the fish hold could not conceal such a large amount of cocaine, that the packages thrown from the vessel were not the ones later recovered, and that no radio was on board. Savala Cisneros was able to review photographs of the lost evidence and extensively question the Coast Guard personnel present the day the *Cristiano Ronaldo* was interdicted.

## VII.

Despite Savala Cisneros's arguments to the contrary, the district court did not err in admitting Officer Arambula's testimony about the statements and actions of another Coast Guard crew member, Officer Ligsay.

First, the district court did not err in admitting Officer Arambula's testimony that he saw Officer Ligsay inspect the fish hold of the *Clara Luz*, the vessel that the

officers stopped before encountering the *Cristiano Ronaldo*, and that in his opinion Officer Ligsay did not appear concerned during and after the inspection. While Officer Arambula's testimony permitted the Government to argue that the *Clara Luz* did not contain anything suspicious and therefore could not have been the source of the cocaine found in the water, Savala Cisneros has not shown that Officer Ligsay's nonverbal conduct constituted a statement. Nonverbal conduct can constitute a statement where the person intended the conduct to communicate a message, but nothing in the record suggests that Officer Ligsay intended through his conduct to communicate any message to Officer Arambula. *See* Fed. R. Evid. 801(a). Officer Ligsay was just inspecting the *Clara Luz*'s fish hold; Officer Arambula just saw that Officer Ligsay did so and that he did not react in a way that displayed concern. That conduct and reaction are not hearsay because they are not statements.

Nor did the district err in admitting Officer Arambula's testimony about Officer Ligsay's joke. Officer Arambula testified that on the *Cristiano Ronaldo* there was "a box of chicken" with "some bones . . . and a few pieces of chicken," and that "Officer Ligsay asked [the four defendants] if they were using the chicken as bait and then we just all laughed." Officer Ligsay's question appears not to have been a statement offered to prove the truth of the matter asserted—indeed, it is unclear just what the question asserts. Savala Cisneros nevertheless argues that

28

Officer Ligsay's question allowed the jury to infer that no bait was on the boat. But even if it did, and even if Officer Ligsay intended his question to assert that there was no bait on the *Cristiano Ronaldo*, admitting Officer Arambula's testimony about the question did not prejudice Savala Cisneros, as improper admission of hearsay, to warrant reversal, must have had a "substantial influence on the outcome" of the case. *United States v. Fortenberry*, 971 F.2d 717, 722 (11th Cir. 1992). There was more than sufficient evidence establishing Savala Cisneros's guilt outside of the existence or non-existence of bait on the *Cristiano Ronaldo*.

Finally, the Government concedes the hearsay nature of Officer Arambula's testimony about Officer Ligsay's comment that the cocaine bales they pulled from the water were weighted down with cement. Savala Cisneros claims the Government used this hearsay testimony to support its theory of the case in closing, by arguing that the defendants had thrown the cocaine from the boat, hoping the concrete buckets would sink the cocaine and they would evade responsibility. But Savala Cisneros has here again failed to show that he was prejudiced by admission of the testimony. Regardless of whether the cocaine bales were weighted down with cement, strong evidence supported that the bales were

29

thrown overboard the *Cristiano Ronaldo* while the defendants were fleeing from the Coast Guard.[7]

## VIII.

The district court properly applied the two sentencing enhancements that Hernandez Almaraz challenges: a two-level enhancement for "act[ing] as a . . . captain . . . aboard any craft or vessel carrying a controlled substance," U.S.S.G. § 2D1.1(b)(3)(C), and another two-level enhancement for "recklessly creat[ing] a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer," U.S.S.G. § 3C1.2.

The district court properly determined that Hernandez Almaraz "acted" as the captain of the *Cristiano Ronaldo* under U.S.S.G. § 2D1.1(b)(3).  Hernandez Almaraz identified himself as the captain when the Coast Guard boarded the vessel; he held a captain's license in Guatemala; and Lopez Hernandez later confirmed that Hernandez Almaraz was the ship's captain.  Hernandez Almaraz

---

[7] Savala Cisneros also cites the Confrontation Clause in his brief, but fails to develop the claim, only stating that "Savala Cisneros was deprived [of] his Sixth Amendment right to confront the witnesses against him, by the court's erroneous admission of hearsay testimony."  The Confrontation Clause was not raised below.  Before the district court, defense counsel objected to only one of the three statements Savala Cisneros now challenges, and even that objection challenged the testimony only on hearsay grounds.  Plain error review therefore applies.  *See United States v. Arbolaez*, 450 F.3d 1283, 1291 n.8 (11th Cir. 2006).  Under plain error review, Savala Cisneros bears the burden of establishing that the district court erred.  *See United States v. Aguilar-Ibarra*, 740 F.3d 587, 592 (11th Cir. 2014).  Because Savala Cisneros has not developed the Confrontation Clause claim, he has not established that the district court plainly erred in admitting this testimony.

relies on cases like *United States v. Cartwright*, 413 F.3d 1295 (11th Cir. 2005), to argue that while that evidence may show that he was the ship's captain, it does not show that he "acted" as such. *Cartwright* did focus on whether the defendant "acted" as a captain by operating the vessel, but the case did so in the context of expanding the scope of § 2D1.1(b)(3) to apply to the defendant who was "a lifelong fisherman" and who was "driving the boat when the Coast Guard boarded it," even though he "was not officially named the captain." *Cartwright*, 413 F.3d at 1299. That case shows therefore that a non-captain can "act" as a captain under § 2D1.1(b)(3); it does not show that a captain does not "act" as a captain when he is not operating the boat. A captain generally acts as a captain as the ship's ultimate decisionmaker, even when the captain delegates aspects of the operation of the vessel. The district court properly determined that Hernandez Almarez "acted" as the *Cristiano Ronaldo*'s captain based on the evidence that he was the captain.

The district court also properly determined that Hernandez Almaraz "recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer," U.S.S.G. § 3C1.2, by overseeing as its captain the *Cristiano Ronaldo*'s aggressive maneuvers in response to the Coast Guard's approach and orders to halt. The trial testimony established that the boat maneuvered "aggressively" and refused to stop, requiring

31

the Coast Guard helicopter to move close to the vessel in order to follow it and fire warning shots. The district court did not clearly err in finding on that evidence that the aggressive maneuvers "recklessly created a substantial risk of death or serious bodily injury." The district court did not clearly err, either, in attributing the aggressive maneuvers to Hernandez Almaraz, since he was the ship's captain and the district court specifically found that Hernandez Almaraz actively caused the risk by controlling the actions of the boat. This met the requirement, restated in *United States v. Dougherty,* 754 F.3d 1353, 1360 (11th Cir. 2014), that the district court make "a specific finding [] that the defendant actively caused or procured the reckless behavior at issue." *Id.* (citing *United States v. Johnson,* 694 F.3d 1192, 1196–97 (11th Cir. 2012)).

## IX.

The judgments of the district court are affirmed.

32