[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13114
Non-Argument Calendar

_____

D.C. Docket No. 8:18-cr-00594-SCB-JSS-3

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JORGE RAMON NEWBALL MAY,
CALBOT REID-DILBERT,
RUDOLPH RANDOLPH MEIGHAN,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(February 24, 2021)

Before WILSON, ROSENBAUM, and GRANT, Circuit Judges.

PER CURIAM:

Jorge Ramon Newball May ("Newball May"), Calbot Reid-Dilbert ("Reid-Dilbert"), and Rudolph Randolph Meighan ("Meighan") appeal their convictions and sentences for trafficking cocaine in international waters, in violation of the Maritime Drug Law Enforcement Act ("MDLEA"). *See* 46 U.S.C. § 70501–70508. The defendants were apprehended on a go-fast vessel in international waters after having jettisoned their cargo, which was not recovered. A jury concluded that they were guilty of trafficking cocaine based in part on "Ionscan" testing evidence showing the presence of trace amounts of cocaine on the vessel and the hands of all three defendants. Then, at sentencing, the district court determined a drug quantity in excess of 450 kilograms of cocaine, applied enhancements for obstruction of justice, and rejected the defendants' requests for a minor-role reduction.

Broadly speaking, the defendants raise four issues on appeal: (1) whether the admission of a certification of the U.S. State Department to establish extraterritorial jurisdiction under the MDLEA violated their rights under the Confrontation Clause; (2) whether the district court abused its discretion by admitting the Ionscan testing evidence at trial; (3) whether sufficient evidence supports their convictions; and (4) whether the district court properly calculated their guideline ranges. After careful review, we affirm. We address each issue in turn.

## I. MDLEA Jurisdiction

Newball May contends that the district court violated his rights under the Confrontation Clause by relying on a certification from the U.S. State Department to establish jurisdiction under the MDLEA. Reid-Dilbert and Meighan adopt this argument. We review constitutional objections *de novo*. *United States v. Campbell*, 743 F.3d 802, 805 (11th Cir. 2014).

The MDLEA broadly prohibits drug trafficking while on board any vessel "subject to the jurisdiction of the United States." *See* 46 U.S.C. § 70503(a). A vessel subject to the jurisdiction of the United States includes a "vessel without nationality," which, in turn, includes "a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." *Id.* § 70502(c)(1)(A), (d)(1)(C). A foreign nation's consent or waiver of objection to United States jurisdiction is conclusively proven by a certification from the State Department. *Id.* § 70502(c)(2). Whether a vessel is subject to the jurisdiction of the United States "is not an element of an offense" but rather a "[j]urisdictional issue" that is a "preliminary question[] of law to be determined solely by the trial judge." *Id.* § 70504(a).

In support of its pretrial motion to establish that the defendants' vessel was subject to the jurisdiction of the United States, the government introduced a

certification on behalf of the U.S. State Department stating that the vessel met the definition of a "vessel without nationality." The district court found jurisdiction, overruling a defense objection based on the Confrontation Clause.

Under binding precedent, the district court correctly found that the introduction of a State Department certification to establish MDLEA jurisdiction does not violate the Confrontation Clause. In *Campbell*, we held that "a pretrial determination of extraterritorial jurisdiction does not implicate the Confrontation Clause" because the MDLEA's jurisdictional requirement is not an element of an offense. 743 F.3d at 806–09. Likewise, in *United States v. Cruickshank*, we held that "[a] United States Department of State certification of jurisdiction under the MDLEA does not implicate the Confrontation Clause because it does not affect the guilt or innocence of a defendant." 837 F.3d 1182, 1192 (11th Cir. 2016).

Defendants maintain that *Campbell* and *Cruickshank* were wrongly decided and that their rights to confrontation attached during the pretrial determination of MDLEA jurisdiction. Whatever the merits of these arguments, we must follow our prior precedent. *See United States v. Vega-Castillo*, 540 F.3d 1235, 1236 (11th Cir. 2008) ("Under the prior precedent rule, we are bound to follow a prior binding precedent unless and until it is overruled by this court en banc or by the Supreme Court." (quotation marks omitted)). Accordingly, the district court properly determined that it had jurisdiction.

## II. Admission of Ionscan Evidence

Next, Newball May contends that the district court abused its discretion in denying the defendants' motion to exclude evidence of the Ionscan testing at trial. While he concedes that the government's expert witness was qualified to testify as to the results of the Ionscan testing, he asserts that the government failed to present evidence establishing that the testing procedure itself was the product of reliable scientific principles and methods. Reid-Dilbert and Meighan join this argument.

As part of its case, the government sought to qualify an expert, Coast Guard Senior Chief Maritime Enforcement Specialist Steven Bomentre, to testify about the results of Ionscan testing that the Coast Guard conducted upon boarding the defendants' go-fast vessel. Ionscan technology is designed to detect trace amounts of illicit materials—often amounts so small as to be imperceptible to the human eye. Samples, or "swipes," are taken of areas and objects thought to contain contraband and then run through the Ionscan machine (here, the Ionscan 500DT), which interprets the samples. Ionscan testing in this case revealed trace amounts of cocaine on both sides of the vessel, near the cargo hold of the vessel, and on all four of the vessel's crew members, including the three defendants.

The defendants moved to exclude all Ionscan evidence, including Bomentre's testimony. After holding a hearing to assess the admissibility of the expert testimony, *see Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993), the district

court concluded that the Ionscan technology was sufficiently reliable under *Daubert* and that the expert testimony and Ionscan evidence was admissible.  The court therefore denied the defendants' motion and permitted Bomentre to testify at trial.

We review the district court's decisions regarding the admissibility of expert testimony and the reliability of an expert opinion for an abuse of discretion.  *United States v. Barton*, 909 F.3d 1323, 1330 (11th Cir. 2018).  "This abuse-of-discretion standard recognizes the range of possible conclusions the trial judge may reach, and thus affords the district court considerable leeway in evidentiary rulings."  *Id.* (citations and quotation marks omitted).  We must affirm the district court unless it has applied the wrong legal standard or made a clear error of judgment that resulted in substantial prejudice to the defendant.  *Id.* at 1330–31.

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony.[1]  Fed. R. Evid. 702.  The district court is the gatekeeper for expert testimony and is tasked with ensuring that it is sufficiently reliable and relevant to

---

[1] Rule 702 states in full as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

be considered by the jury. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–48 (1999). The Supreme Court in *Daubert* listed four factors for determining whether expert testimony is sufficiently reliable for admission under Rule 702. *Daubert*, 509 U.S. at 592–94. They include (1) whether it can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field. *Id.*

Nevertheless, the inquiry is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. *United States v. Brown*, 415 F.3d 1257, 1267 (11th Cir. 2005). Whether the *Daubert* factors are relevant to "assessing reliability in a given case will depend[] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 1268 (quotation marks omitted). So expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible. *Id.* In *Brown*, for example, we upheld the admission of expert testimony that met only the "general acceptance" *Daubert* factor. *Id.* (explaining that the experts' "method and conclusions were not quantitative or testable by the scientific method" and that the government offered no supporting peer-review studies, but that the court reasonably credited the experts' testimony that their method was "generally accepted").

7

The defendants' sole argument is that the government failed to offer any evidence showing that the Ionscan technology itself is a reliable tool for identifying the presence of narcotics.[2] They do not dispute that Bomentre was otherwise qualified to testify as an expert about Ionscan technology or to interpret the results from the Ionscan machine used in this case.

Here, the district court did not abuse its discretion in denying the defendants' motion to exclude the Ionscan evidence at trial because it reasonably concluded that the Ionscan technology was sufficiently reliable for admission. At the *Daubert* hearing, the government's expert, Bomentre, who had extensive training and experience with Ionscan testing, testified in relevant part that Ionscan testing was "generally accepted as a method of detecting trace amounts of narcotic substances on surfaces"; was widely used by the Coast Guard and other federal agencies, including at airports, the border, and the U.S. Capitol; had a published error or false-alarm rate of less than one percent, with false negatives more likely than false positives; and was supported by peer-reviewed studies showing that ion mobility spectrometry, the technology used by the Ionscan machine, was "highly reliable in detecting specific molecules that it's looking for." Based on this testimony, which

---

[2] We recently upheld the admission of expert testimony regarding Ionscan testing in *United States v. Williams,* 865 F.3d 1328, 1338–41 (11th Cir. 2017), which likewise involved defendants accused of drug trafficking on a vessel on which no drugs were recovered. But *Williams* is not controlling here because the defendants in that case, unlike the defendants here, "concede[d] that Ionscan technology is, in general, a reliable tool for identifying the presence of narcotics—and cocaine specifically—in a given location. *Id.* at 1338–39.

suggests that the Ionscan technology has been tested, peer reviewed, has a low error rate, and is generally accepted, *see Daubert*, 509 U.S. at 592–94, the district court reasonably concluded that the expert testimony and evidence was sufficiently reliable for admission under Rule 702.

The defendants respond that Bomentre simply "regurgitate[d] the manufacturer's claim that the machine had an error rate of less than 1%" but could not explain how that error rate was derived. But even assuming Bomentre's testimony on this point could not be credited, the defendants offer no response to other aspects of his testimony, including that Ionscan testing and its underlying methodology are generally accepted in the scientific community and widely used for the detection of trace amounts of narcotics. *See Brown*, 415 F.3d 1267–68 (relying solely on the "general acceptance" *Daubert* factor to uphold the admission expert testimony). Given the flexible nature of the gatekeeping inquiry, the district court acted well within its discretion in concluding that the government met its burden of proving the reliability of the Ionscan testing used in this case.

### III. Sufficiency of the Evidence

Newball May next argues that insufficient evidence supports his convictions, asserting that the government failed to prove that the go-fast vessel contained cocaine. Reid-Dilbert and Meighan adopt this argument.

9

We review *de novo* whether sufficient evidence in the record supports the jury's verdict in a criminal trial. *United States v. Wilchcombe*, 838 F.3d 1179, 1188 (11th Cir. 2016). The evidence, which we view in the light most favorable to the government, "must be such that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Id.* (quotation marks omitted). But it need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except guilt. *United States v. Williams*, 865 F.3d 1328, 1344 (11th Cir. 2017). In reviewing the evidence, we assume that the jury made all credibility choices in support of the verdict, and we accept all reasonable inferences that tend to support the government's case. *Id.*

## A. Trial Evidence

In the light most favorable to the government, the evidence offered at trial established as follows. On December 1, 2018, a Coast Guard airplane conducting counter-narcotics surveillance observed four persons on a tarp-covered go-fast vessel that was floating in a known drug-trafficking area about 100 miles southwest of Jamaica. After relaying information about the vessel to a command center, which contacted a nearby Canadian vessel, the HMCS *Moncton*, to intercept, the Coast Guard plane continued to surveil the go-fast vessel for approximately three hours from an altitude of 6,500 to 7,000 feet.

When the Coast Guard plane arrived in the area, the go-fast vessel began to move erratically, though it made no sign of distress, and Coast Guard air personnel saw multiple crew members on the go-fast vessel tying together and jettisoning groups of white, rectangular packages. None of these packages were recovered, although multiple Coast Guard witnesses testified that they were consistent with 20-kilogram packages of cocaine that they had personally recovered and handled during prior interdictions of similar go-fast vessels. Video footage from the Coast Guard plane, which depicted the crew jettisoning the packages, was played for the jury.

Eventually, the *Moncton* intercepted the go-fast vessel and sent out Coast Guard boarding teams, which had been stationed aboard the *Moncton* to conduct law enforcement and counter-drug operations. The boarding teams found a black, 30-foot by 7-foot vessel that had no engines, no navigation lights, no electronic equipment except a cellphone, lines or ropes hanging over the side that had been cut, and about a dozen 55-gallon fuel drums set up so the crew could switch quickly between them. The two outboard engines had been removed and jettisoned along with the packages.

When the boarding teams reached the go-fast vessel, Emiro Hinestroza-Newbbooll, whose trial was severed from the three defendants in this case, identified himself as the captain. He stated that the crew had departed Colombia and had been fishing for mahi-mahi. When questioned about their fishing gear, which was

11

nowhere in sight, the captain changed the story and stated that they had been scuba diving for conch shells. But they had no scuba gear, either, and produced just one snorkeling mask. The captain advised that they had been fishing in the area, but the depth of the water was roughly 1,300 feet, making conch fishing without scuba gear somewhat impractical. The captain further stated that the crew had jettisoned the conch shells when they saw the Coast Guard plane because it was illegal to fish for them in Colombia. The captain stated that they had been out of fuel for six days and had used the engines as anchors, though the lines broke. The captain also claimed Colombian registry, but the crew lacked required Colombian documentation regarding the vessel and trip.

No quantity of drugs was found aboard the go-fast vessel, nor were any of the jettisoned packages recovered, as they apparently sank. In an attempt to detect the presence of contraband aboard the vessel, Coast Guard personnel used an Ionscan machine, which as we have noted, analyzes samples or "swipes" of areas or objects to detect tract amounts of illicit materials. Coast Guard personnel took samples from various parts of the vessel and from its crew and ran them through the Ionscan machine. Of the eighteen samples analyzed, nine tested positive for cocaine, including the vessel's left and right rails and center hold and the hands of all four of the go-fast's crew.

Following their arrests, the defendants spoke with authorities. Meighan stated that, before the trip, he had traveled from Belize to Colombia at the expense of Mexican nationals who he believed were the intended recipients of cocaine from the venture. He also stated that he likely tested positive for cocaine because he helped jettison bales from the go-fast vessel, though he denied seeing the bales before that time. Reid-Dilbert stated that he was offered approximately $1,500 to go on a conch-fishing trip. According to Reid-Dilbert, the go-fast vessel had mechanical problems during the trip, and they eventually used the engines as anchors. Reid-Dilbert recognized the jettisoned packages as cocaine bales, though he too denied knowing about the bales or the presence of drugs before the crew began jettisoning the packages. Newball May reported that the crew had dived for conch near the Serrana Bank, an atoll in the western Caribbean sea, before running out of fuel on the way to its next destination. Upon seeing what he believed to be a Colombian Coast Guard airplane, Newball May jettisoned the bags of conch by tying them to the two engines so they would sink. He said there were approximately fifteen to seventeen bags of conch tied to each engine.

*B. Analysis*

All three defendants were convicted of conspiracy to distribute and to possess with intent to distribute at least five kilograms of a substance containing cocaine while on board a vessel subject to the jurisdiction of the United States, in violation

of 46 U.S.C. §§ 70503(a)(1) and 70506(b), and of possession with intent to distribute at least five kilograms of a substance containing cocaine while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1) and 70506(a).

To convict a defendant for conspiracy, the government must prove that two or more persons entered into an unlawful agreement to commit an offense and that the defendant knowingly and voluntarily joined the conspiracy. *Williams*, 865 F.3d at 1344. In maritime drug-trafficking cases, a jury may infer a defendant's "knowledgeable, voluntary participation from presence when the presence is such that it would be unreasonable for anyone other than a knowledgeable participant to be present." *Wilchcombe*, 838 F.3d at 1188 (quotation marks omitted). In making this determination, the jury may consider several factors, including the probable length of the voyage, the amount and location of the contraband, the relationship between captain and crew, suspicious or evasive behavior before and after apprehension, post-apprehension statements, and the absence of supplies or equipment necessary to the vessel's intended use. *Id.* at 1188–89. "The government bears a heavier burden where the quantity of drugs is smaller; if the quantity of drugs is 'large,' the government need only prove any one of the additional factors listed above." *Id.* at 1189.

14

To convict a defendant for possession with intent to distribute a controlled substance, the government must prove knowing possession and an intent to distribute. *Williams*, 865 F.3d at 1344. Possession may be actual or constructive. *United States v. Tinoco*, 304 F.3d 1088, 1123 (11th Cir. 2002). If a defendant had some measure of dominion or control over the contraband, either exclusively or together with others, he constructively possessed it. *Id.*

For either offense, the government must prove the identity of the drug through direct or circumstantial evidence. *Williams*, 865 F.3d at 1344. Generally, drug identity can be established by evidence of "lay experience based on familiarity through prior use, trading, or law enforcement; a high sales price; on-the-scene remarks by a conspirator identifying the substance as a drug; and behavior characteristic of sales and use, such as testing, weighing, cutting and peculiar ingestion." *Id.* (quotation marks omitted).

Here, the district court properly denied the defendants' motions for judgment of acquittal because sufficient evidence supports their convictions. The evidence shows that the defendants were on board a tarp-covered go-fast vessel, outfitted with a dozen 55-gallon fuel drums set up so the crew could switch quickly between them, in a known drug-trafficking area. When the Coast Guard plane encountered the go-fast vessel, it began to move erratically, and Coast Guard witnesses saw the vessel's crew tying together and jettisoning groups of white, rectangular packages, which

15

then apparently sank along with the vessel's engines. While none of these packages were recovered, a reasonable jury could conclude from the evidence as a whole that the packages contained cocaine and that each of the three defendants knew of the cocaine and voluntarily trafficked it.

To begin with, that no cocaine was recovered does not preclude conviction for cocaine trafficking. In *Williams*, we held that sufficient evidence supported the jury's determination that jettisoned packages contained cocaine, even though no witness identified the jettisoned contraband as cocaine and no cocaine was recovered. 865 F.3d at 1344–46. We explained that the question was "whether all of the evidence presented by the government, taken together, permitted any reasonable jury to arrive at that conclusion," not whether any single piece of evidence on its own sufficed. *Id.* at 1346. The evidence in *Williams* showed that Coast Guard witnesses had been involved in previous drug interdictions in the area and only cocaine had been recovered, that the packages they saw jettisoned from the go-fast vessel were the same size and shape as bales of cocaine seized previously, and that Ionscan testing revealed traces of cocaine on the vessel and on the person of four of the five defendants. *Id.* "The cumulative effect of this evidence," we stated, "was enough to permit a reasonable jury to determine, beyond a reasonable doubt, that the substance jettisoned from the vessel was cocaine, notwithstanding the fact that no visible amount of cocaine was recovered by the Coast Guard." *Id.*

16

The same is true here.  As in *Williams*, multiple Coast Guard witnesses testified that the packages jettisoned from the go-fast vessel were consistent with 20-kilogram cocaine bales they had personally recovered and handled during prior interdictions.  Likewise, Ionscan samples of the vessel and its four crew members tested positive for cocaine.  In particular, nine Ionscan samples tested positive for cocaine, including from the vessel's left and right rails and center hold and the hands of the crew.  Along with this evidence, the jury heard testimony about post-arrest statements made by Meighan and Reid-Dilbert in which they admitted or did not dispute that there was cocaine aboard the go-fast vessel, even though they denied knowing about the cocaine or the packages until after the Coast Guard arrived.  Reid-Dilbert stated that he recognized the jettisoned packages as cocaine bales, and Meighan stated that he likely tested positive for cocaine because he helped jettison bales from the go-fast vessel.  Viewing this evidence as a whole, a reasonable jury could find beyond a reasonable doubt that the jettisoned packages contained cocaine in excess of five kilograms.

The defendants claim that they presented a reasonable, alternative explanation—that the packages contained conch, which was considered contraband in Colombia—that the government failed to rebut.  So in their view, the lack of evidence of actual cocaine dooms the case against them.  They are mistaken on the evidence and on the law.

17

To the extent the defendants' proffered explanation was "supported by some modicum of evidence, the jury was not required to return a verdict of acquittal" but was instead "free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *Williams*, 865 F.3d at 1345–46 (quotation marks omitted). In any event, the government's evidence gave the jury good reason to discredit the defendants' explanation. Apart from a single snorkeling mask, there was nothing on board the go-fast vessel to corroborate the defendants' claim that they had been fishing for conch or anything else. The evidence also tended to contradict the defendants' post-arrest claims of experiencing engine problems and drifting for six days. For instance, the Coast Guard plane observed the go-fast vessel's engines in operation, and the go-fast vessel's crew gave no sign of distress when it saw the plane. Combined with the evidence supporting the presence of cocaine in the jettisoned packages, this was more than sufficient for a reasonable jury to reject the defendants' explanation.

Beyond the issue of whether the government proved the existence of cocaine on the go-fast vessel, the defendants compare this case to *United States v. Garate-Vergara*, 942 F.2d 1543, 1549 (11th Cir. 1991), where we vacated the convictions of certain defendants because the evidence did not link them to the cocaine jettisoned from the subject vessel. But the circumstances of that case were very different. The vessel in *Garate-Vergara* was approximately 330 feet in length with a crew of

18

thirteen, and the contraband had been thoroughly hidden, weakening the inferences that could be drawn about the crew's knowledge from its presence onboard the vessel. *See id.* (describing the large size of the vessel as the "[m]ost important" fact supporting acquittal).

Here, in contrast to the situation in *Garate-Vergara*, the go-fast vessel was approximately thirty feet in length with a crew of four, it appears to have contained a substantial amount of cocaine and little else, and there is no evidence that the contraband was hidden. Plus, the defendants' post-arrest statements indicated that they helped jettison the cargo, and the hands of all four crew members tested positive for cocaine. Given the small vessel and crew, large amount of cocaine, absence of fishing gear, and evidence of direct participation in jettisoning the contraband, a reasonable jury could infer the defendants' knowing and voluntary participation in the cocaine-trafficking conspiracy, as well as their constructive possession with intent to distribute. *See Williams*, 865 F.3d at 1344; *Wilchcombe*, 838 F.3d at 1188; *Tinoco*, 304 F.3d at 1123.

For these reasons, we affirm the defendants' cocaine-trafficking convictions under the MDLEA.

## IV. Sentencing

Finally, the defendants present three sentencing challenges. First, Meighan argues that the district court clearly erred in calculating a drug weight of 450

kilograms or more of cocaine.    Second, Newball May contends that the court committed clear error by applying the U.S.S.G. § 3C1.1 enhancement for obstruction of justice.    Finally, Reid-Dilbert challenges the court's denial of a minor-role reduction.    Each defendant purports to adopt the arguments made by his codefendants.

## A.  Drug Quantity

We begin with drug quantity.  At the defendants' joint sentencing, the district court held each of the defendants responsible for 450 kilograms or more of cocaine, which triggered the highest base offense level of 38.  *See* U.S.S.G. § 2D1.1(c)(1). Based on testimony presented at trial and at the sentencing hearing, the court found that the offense involved more than thirty bales of cocaine that each weighed twenty kilograms.  The defendants maintain the court should have adopted the jury's finding that the offense involved five kilograms or more of cocaine, for a base offense level of 30.  *See* U.S.S.G. § 2D1.1(c)(5).

We review for clear error the district court's determination of the quantity of drugs used to establish a base offense level for sentencing purposes.  *United States v. Ruan*, 966 F.3d 1101, 1171 (11th Cir. 2020).  The government must establish the drug quantity by a preponderance of the evidence.  *Id*. at 1172.  The district court must ensure the government carries this burden by presenting "reliable and specific evidence."  *Id*.  When the drug amount seized does not reflect the scale of the offense,

the court must approximate the drug quantity. *Id.* This determination may be based on "fair, accurate, and conservative estimates" of the quantity attributable to a defendant but cannot be based on "merely speculative" calculations. *Id.* (quotation marks omitted).

Here, the district court did not clearly err in finding a drug quantity of 450 kilograms or more of cocaine. The court had to approximate the amount of cocaine because none of it was recovered. Based on the evidence presented at trial and at sentencing, at least 450 kilograms was a reasonable and conservative estimate.

A government agent testified at sentencing that the captain of the go-fast vessel, Hinestroza-Newbboll, stated in a post-arrest interview that there were thirty-eight bales of cocaine on the vessel.[3] That number was broadly consistent with Newball May's statement to authorities that the go-fast crew jettisoned at least thirty packages (though he claimed the packages were filled with conch, not cocaine), and with the number of packages indicated by the surveillance footage, which the court viewed the day before sentencing. In addition, Coast Guard witnesses testified at

---

[3] The district court properly relied on hearsay statements made by Hinestroza-Newbboll. Hearsay is admissible in a sentencing hearing provided it is sufficiently reliable. *United States v. Baptiste*, 935 F.3d 1304, 1315–16 (11th Cir. 2019). Here, Hinestroza-Newbboll's hearsay statements about the quantity of cocaine on the go-fast vessel have sufficient "indicia of reliability" because they were consistent with the government's other evidence, and the defendants provide no reason to discount their reliability. *See id.* at 1316–17. As for the defendants' own statements, these were evidence at trial and therefore properly before the court at sentencing. *See United States v. White*, 663 F.3d 1207, 1216 (11th Cir. 2011) ("The district court may base its findings of fact at sentencing on evidence presented at trial, undisputed statements in the PSR, and evidence presented at the sentence hearing.").

trial based on personal experience that the packages observed in the surveillance video were consistent with twenty-kilogram cocaine bales, which was a standard size in maritime cocaine trafficking.

The record therefore supports a finding that the go-fast vessel contained at least thirty cocaine bales that each weighed twenty kilograms, for a total drug quantity of 600 kilograms, well in excess of the 450-kilogram quantity necessary to trigger the highest base offense level.

## B. *Obstruction of Justice*

For each defendant, the district court applied a two-level enhancement for obstruction of justice, U.S.S.G. § 3C1.1, based on the defendants' jettisoning of cocaine from the go-fast vessel upon seeing the Coast Guard plane. The defendants contend that this conduct could not support the enhancement because no official investigation or prosecution existed at that time, and because the Coast Guard had not yet determined that the vessel was subject to the jurisdiction of the United States.

In evaluating the imposition of an obstruction-of-justice enhancement, we review *de novo* the district court's interpretation and application of the Guidelines, and we review for clear error its underlying factual findings. *United States v. Doe*, 661 F.3d 550, 565 (11th Cir. 2011).

Under U.S.S.G. § 3C1.1, a defendant's offense level is increased by two levels if the defendant willfully obstructed or impeded, or attempted to obstruct or impede,

22

the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense and the obstructive conduct related to, among other things, the defendant's offenses of conviction.  U.S.S.G. § 3C1.1.  According to § 3C1.1's commentary, this guideline may cover obstructive conduct that occurred before the start of the investigation if the conduct was purposefully calculated and likely to thwart the investigation or prosecution of the offense.  *Id.*, cmt. n.1.  Conduct covered by this enhancement includes "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding."  *Id.*, cmt. n.4(D).[4]

Here, the district court did not clearly err in finding that the defendants obstructed justice within the meaning of U.S.S.C. § 3C1.1.  The fact that no "official investigation or prosecution" existed at the time the packages were jettisoned does not, as the defendants claim, defeat application of the enhancement.  Rather, according to the commentary, the enhancement still applies "if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."  U.S.S.G. § 3C1.1, cmt. n.1.  That standard was met here.

---

[4] The defendants do not claim that their destruction of evidence occurred "contemporaneously with arrest."  *See* U.S.S.G. § 3C1.1, cmt. n.4(D) (explaining that destruction of evidence that occurs "contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance)" does not count "unless it results in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender.").  Even if we assume the destruction of evidence was sufficiently contemporaneous, however, the enhancement for obstruction of justice would still be appropriate because the failure to recover the cocaine as evidence materially hindered the official investigation and prosecution.  *See id*.

The record reflects that, after seeing the Coast Guard plane, the defendants jettisoned and sank the cocaine they were transporting.  The time-consuming and involved procedure of tying the bales to the engines and sinking them was purposefully calculated to thwart the investigation and prosecution by attempting to destroy all evidence of the crime.  *See United States v. Wayerski*, 624 F.3d 1342, 1352 (11th Cir. 2010) ("The defendants' affirmative steps to prevent law enforcement from detecting their illicit activity and to impede any investigation show that they consciously acted with the purpose of obstructing justice.").  Given this willfully obstructive conduct, the district court properly applied the enhancement.

As for the defendants' jurisdictional argument, they offer no legal support for their claim that the alleged obstructive acts are not properly before the district court at sentencing because they occurred before the Coast Guard determined that the vessel was subject to the jurisdiction of the United States.  Nor do we find their argument persuasive.  The alleged acts of obstruction are clearly relevant conduct to the instant offenses of conviction, over which the district court properly found jurisdiction.  *See* U.S.S.G. § 1B1.3(a)(1)(A); *cf. United States v. Behr*, 93 F.3d 764, 765–66 (11th Cir. 1996) ("[D]istrict court[s] may consider criminal conduct that occurred outside of the statute of limitations period as relevant conduct for sentencing purposes.").

For these reasons, we affirm the § 3C1.1 enhancement for all three defendants.

## C. Minor Role Reduction

Finally, the defendants claim that they were simply "pawn[s]" in the transport of the cocaine and should be granted role adjustments as minor participants. We review a district court's denial of a role reduction for clear error. *Cruickshank*, 837 F.3d at 1192. "Clear error review is deferential, and we will not disturb a district court's findings unless we are left with a definite and firm conviction that a mistake has been committed." *Id.* (quotation marks omitted). The defendant must prove his minor role in the offense by a preponderance of the evidence. *Id.*

Section 3B1.2 provides for a two-level decrease to the defendant's offense level if he was a "minor participant" in the criminal activity. A "minor participant" is someone "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, cmt. n.5.

In *United States v. De Varon*, we instructed that, in assessing a defendant's role in the criminal activity, the district court should consider two principles: first, the defendant's role in the relevant conduct for which he has been held accountable at sentencing, and second, his role as compared to that of other identifiable or discernible participants in the relevant conduct. 175 F.3d 930, 940 (11th Cir. 1999) (*en banc*). Nevertheless, the fact that a defendant's role is less than other

25

participants' roles in the relevant conduct may not be dispositive because it is possible that none of them are minor or minimal participants. *Id.*

The decision whether to apply a mitigating-role reduction is "based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2, cmt. n.3(C). Section 3B1.2's commentary outlines a non-exhaustive list of factors relevant to determining the defendant's role. *See id.*; *see also Cruickshank*, 837 F.3d at 1193 (explaining that the purpose of this commentary was to "further clarify the factors for a court to consider for a minor-role adjustment" in a way that "still continue[s] to embrace the approach we took in *De Varon*"). These factors include (a) "the degree to which the defendant understood the scope and structure of the criminal activity"; (b) "the degree to which the defendant participated in planning or organizing the criminal activity"; (c) "the degree to which the defendant exercised decision-making authority"; (d) "the nature and extent of the defendant's participation in the commission of the criminal activity"; and (e) "the degree to which the defendant stood to benefit from the criminal activity." *Id.*

Here, based on the totality of the circumstances, the district court did not clearly err in denying the defendants' request for a minor-role reduction. Under *De Varon*'s first principle, the inquiry is whether the defendant "played a relatively minor role in the conduct for which [he] has already been held accountable—not a

minor role in any larger criminal conspiracy." *De Varon*, 175 F.3d at 944. As the record shows, all three defendants knowingly participated in the illegal transportation of a large quantity of cocaine, they and their transportation roles were important to that scheme, and they were held accountable for that conduct only. *See United States v. Cabezas-Montano*, 949 F.3d 567, 607 (11th Cir. 2020) (considering these same factors in affirming the denial of a minor-role reduction).

In addition, under *De Varon*'s second principle, the record supports the district court's finding that none of the defendant were "less culpable than most other participants in the criminal activity." U.S.S.G. § 3B1.2, cmt. n.5. While the three defendants appear to have had less of a role than codefendant Hinestroza-Newbboll, the captain of the vessel, that fact alone does not make them minor participants because "it is possible that none are minor or minimal participants." *De Varon*, 175 F.3d at 944. The evidence supports that all three defendants helped jettison and sink the cocaine when the Coast Guard began surveillance. And none of the defendants presented evidence "to show how they were less culpable than 'most other participants' in the criminal activity," although it was their burden to do so. *See Cabezas-Montano*, 949 F.3d at 607.

The defendants stress that they were simply couriers in an international criminal organization. But under *De Varon*, "[t]he conduct of participants in any larger criminal conspiracy is irrelevant." 175 F.3d at 944. Nor did the defendants

27

submit evidence "at trial or at sentencing regarding any other co-conspirators, let alone anyone who recruited or trained the defendants, plotted the offense, or owned the drugs." *Cabezas-Montano*, 949 F.3d at 607.

We agree with the defendants to the extent that none of the foregoing facts made them ineligible for a minor-role reduction. *See* U.S.S.G. § 3B1.2, cmt. n.3(A) ("[A] defendant who is convicted of a drug trafficking offense, whose participation in that offense was limited to transporting or storing drugs and who is accountable under § 1B1.3 only for the quantity of drugs the defendant personally transported or stored may receive an adjustment under this guideline."). And there is no evidence that the defendants participated in planning the criminal activity, exercised decision-making authority, or had much discretion in performing their courier role, which are relevant factors under the commentary. *See id.*, cmt. n.3(C)(ii)–(iv).

Nevertheless, under the totality of the circumstances, and in light of *De Varon*, we are not left with a definite and firm conviction that the district court made a mistake in finding that the defendants did not have a minor role in the offense. The court did not misapply a rule of law, and its decision was supported by the record as a whole. *See Cruickshank*, 837 F.3d at 1192. We therefore affirm the district court's denial of the defendants' request for a minor-role reduction.

## V.  Conclusion

In sum, and for the foregoing reasons, we affirm the defendants' convictions and sentences for trafficking cocaine in international waters.

**AFFIRMED.**